Argued and submitted March 5, affirmed August 1, reconsideration denied September 19, petition for review denied October 2, 1990 (310 Or 422)

STATE OF OREGON,
*Respondent,*

*v.*

MARK JAMES WOODS,
*Appellant.*

(TC88-13344; CA A60576)

796 P2d 1209

Ted M. Miller, Portland, argued the cause and filed the briefs for appellant.

David L. Runner, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Richardson, Presiding Judge, and Newman and Deits, Judges.

DEITS, J.

## DEITS, J.

· Defendant appeals his conviction for driving under the influence of intoxicants. ORS 813.010. He assigns error to the trial court's denial of his motion to suppress and to the conclusion of the trial court, after a stipulated facts trial, that defendant's arrest for DUII was valid. We affirm.

On October 6, 1988, at 11:45 p.m., Deputy Sheriff Van Huizen received a report of a "suspicious vehicle" in a bank parking lot. The report was made by employees of a nearby grocery store that had been robbed recently. Van Huizen drove into the parking lot and pulled his car in behind a pickup truck parked in the lot. He did not turn on the overhead lights. He got out of his car and walked to the driver's side of the pickup, where defendant was sitting. It is disputed what occurred next. Defendant contends and the trial court found[1] that Van Huizen immediately asked him for identification, that defendant rolled down his window and gave him his driver's license and that then Van Huizen asked him what he was doing there. The state contends that the window was down when Van Huizen first walked up to the truck and that the officer asked him what he was doing and then asked for identification.

It is undisputed that, in response to the inquiry as to what he was doing, defendant explained to Van Huizen that he had had a fight with his wife and had left his house to "cool down" and that he had come to the bank to withdraw some money from the automatic machine. It is also undisputed that, after he received the license, Van Huizen wrote down information from the license in his notebook and gave it back to

---

[1] The trial court's findings relevant to the timing of the request for identification are as follows:

"[Deputy Van Huizen] exited [sic] his vehicle and approached [defendant]. He shined a light into [defendant's] vehicle, observed [defendant] sitting up straight in the vehicle, and requested identification.

"[Defendant] complied with the request by rolling down the window and producing his driver's license. The officer observed a moderate odor of alcohol and asked what the defendant was doing at that location.

"The defendant advised [sic] of some personal problems with his wife and admitted to drinking some beer.

"The officer confirmed that the defendant's driver's license was valid, returned to the defendant's vehicle and requested the defendant exit [sic] the vehicle."

defendant. He then returned to his patrol car and ran a records check, which showed nothing.

Van Huizen testified that, during their initial conversation, he smelled a moderate odor of alcohol on defendant's breath and noticed that defendant's speech was slurred. After he had run the records check, he returned to the pickup and asked defendant whether he had been drinking. Defendant said that he had been at the parking lot for 20 minutes and had consumed four beers. Van Huizen requested that he step out of the vehicle. Defendant did so but had to steady himself by holding onto the side of the truck. At that time, Van Huizen saw an open can of beer sitting on the floor of the truck. He told defendant that he should not drive, and defendant said that he would not. Van Huizen returned to his patrol car and drove away. About 30 minutes later, he saw defendant driving. He stopped him, administered sobriety tests and arrested him for DUII.

Defendant argues that the initial encounter in the parking lot was a stop and that it was unlawful because, at that time, Van Huizen did not have a reasonable suspicion that he had committed a crime. ORS 131.615(1). Therefore, defendant contends, the trial court erred in refusing to suppress Van Huizen's observations during that encounter and in concluding that the subsequent stop of the vehicle and arrest, which were based on those observations, were lawful.

As noted above, it is disputed when Van Huizen asked defendant for identification. The trial court found that he requested it when he first walked up to defendant's car. We are bound by a trial court's finding of fact, if there is evidence to support it. *Ball v. Gladden*, 250 Or 485, 443 P2d 621 (1968). The state contends that there is no evidence in the record to support the trial court's finding as to the timing of the request.[2] However, it is unnecessary to decide the question

---

[2] The testimony concerning when the stop occurred begins with the District Attorney questioning Van Huizen:

"Q. What did you do after you stopped your car?

"A. I walked up to the driver's window, Mr. Woods was sitting behind the wheel. I immediately smelt the odor of alcoholic beverage on his breath, noted that his speech was somewhat slurred and he had difficulty talking, and I asked him for identification.

"* * * * *

"Q. When you checked him to see if he was wanted or to see if his license was

because, regardless of when Van Huizen asked for identification, he noticed the odor of alcohol and defendant's slurred speech before there had been a sufficient show of authority to constitute a stop.

The request for identification did not in itself transform the encounter into a stop. When defendant gave him the license, Van Huizen stood by the window of the pickup, wrote down the license information in his notebook and immediately handed it back to defendant. At that point, there had not been a sufficient show of authority to constitute a stop. *State v. Jackson,* 91 Or App 425, 755 P2d 732, *rev den* 306 Or 661 (1988); *State v. Horton,* 86 Or App 199, 738 P2d 609 (1987).

---

valid, after that occurred, did you give him his license back?

"A. As soon as I wrote his name down I handed him his license back."

The defense attorney questioned Van Huizen:

"Q. Did you ask Mr. Woods for his identification at the beginning of the conversation?

"A. I'm sure we talked a little about it. At some point I asked him for some ID, I don't know. I didn't walk up and say, I need your identification. I introduced myself, we had some conversation, and then I asked him for the driver's license.

"Q. That conversation would have been what he was doing there?

"A. That, and I had already seen the beer standing on the floor, so we talked about the alcohol prior to that.

"Q. Prior to you asking him for his license?

"A. Yes."

The defense attorney also questioned defendant:

"Q. What was the first thing the officer inquired about?

"A. He asked me what I was doing here — there.

"Q. Did you explain to him what you were doing?

"A. Yes.

"Q. What did you explain to him?

"A. I told him that I had a disagreement with my wife, I left the house. I was at the bank, I had to cool down. I was there—I consumed the alcohol while I was there.

"Q. Did you explain to him why you were in the bank parking lot?

"A. Yes.

"Q. What did you tell him?

"A. I told him I was there to withdraw money from the night teller.

"Q. Did the officer ask you for identification?

"A. Yes.

"Q. Was that at the beginning of the interview?

"A. That was after he first confronted me, after he asked me what I was doing there."

Even under defendant's version of the facts, Van Huizen observed that defendant's breath smelled of alcohol and that his speech was slurred as the exchange concerning the identification took place. The trial court did not err in refusing to suppress Van Huizen's observations made during that encounter or in upholding the subsequent stop and arrest of defendant. *See State v. Johnson,* 93 Or App 242, 761 P2d 1343 (1988), *rev den* 307 Or 405 (1989).

Affirmed.