Submitted December 22, 2008, vacated and remanded for further proceedings July 15, 2009

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

RICHARD LANTZSCH,
*Defendant-Appellant.*

Washington County Circuit Court
C070765CR; A136096

214 P3d 22

Peter Gartlan, Chief Defender, and Mary Shannon Storey, Deputy Public Defender, Legal Services Division, Office of Public Defense Services, filed the brief for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Anna M. Joyce, Assistant Attorney General, filed the brief for respondent.

Before Sercombe, Presiding Judge, and Brewer, Chief Judge, and Deits, Senior Judge.

BREWER, C. J.

## BREWER, C. J.

■　Defendant appeals his conviction for unlawful possession of methamphetamine. He asserts that the trial court erred by denying his motion to suppress the evidence found as a result of a search, because his consent to the search was the unattenuated product of an unlawful seizure of his person. As explained below, we vacate and remand because the trial court did not make a finding of fact regarding whether defendant subjectively believed that he had been seized when the officer, who had completed his investigation and arrest of the driver of the car in which defendant was a passenger, contacted defendant and asked him to get out of the vehicle to speak with him. Whether defendant believed, and whether a reasonable person under the same circumstances could have believed, that his liberty was substantially interfered with, are essential components of our determination of whether his encounter with the police constituted a seizure. *State v. Ashbaugh*, 225 Or App 16, 200 P3d 149 (2008), *rev allowed*, 346 Or 257 (2009). The absence of a finding of fact regarding defendant's subjective belief requires a remand to the trial court for further factfinding.

Defendant was a passenger in a car that a sheriff's deputy observed making an illegal turn at 12:35 a.m. The deputy initiated a traffic stop and asked the driver for her identification. The driver replied that she had no identification, but thought that her license was suspended. The deputy asked her to step out of the car and accompany him to the police cruiser. The driver complied. The deputy then began running a computer check to verify the driver's identity and whether her license was, in fact, suspended. During that time, which the deputy testified lasted "five or six minutes," defendant was left unattended in the passenger seat of the car. The deputy testified that defendant turned to look at the police cruiser several times during that period.

After completing the records check, the deputy arrested the driver on an outstanding warrant. He also searched her, finding a small packet of marijuana. The deputy placed the driver in the back of the police cruiser and then approached defendant, who was still seated in the passenger seat of the car. The deputy stood outside the car, with

defendant still seated in the passenger's seat, and asked defendant to step out of the car and talk to him. The deputy did not tell defendant that he was free to go. The deputy testified that he did not order defendant to get out of the car but, rather, merely asked him to step out so they could talk. Defendant got out of the car and was asked to walk back to the rear of the car to meet the deputy. By this time, a second deputy had arrived to act as a cover officer and was standing behind the deputy who had first contacted defendant. As they reached the rear of the car, the deputy asked defendant whether he had any "weapons or contraband." The deputy testified that he asked defendant the question because

> "[w]ell, the initial—the initial stop, a couple things I had noticed was the car had—still a bunch of backpacks and stuff in it, as well as the defendant and the [driver], they had sores on their face, which is typical of someone that's been using a controlled substance, such as methamphetamine, as well as after I had already contacted [the driver] and found marijuana on her, people that—not a really nice way to put it—people that use drugs tend to carry knives and weapons, not to mention most people—in my experience people that—if someone uses drugs, their friends are going to use drugs, as well."

Defendant told the deputy that he was carrying a pocketknife. The deputy asked defendant if he could "check" for the knife. The deputy testified that he wanted to search defendant because

> "he's still got a weapon on him.
>
> "\* \* \* \* \*
>
> "And I don't know as a police officer whether that weapon is going to be immediately a danger in two seconds from now or ten minutes from now."

The deputy searched defendant, and found a package of methamphetamine in defendant's pants pocket.

Defendant argued before the trial court that the deputy had substantially interfered with his liberty because "[the state is] saying that he was a witness, therefore they were going to question him, therefore he wouldn't feel free to leave because they believed he's a witness, and they wanted

to stay there to talk to him." Defendant argued that the seizure was not supported by a reasonable suspicion that he had committed a crime, because the deputy had testified that "they wanted him to stay because they wanted to figure out who [the driver] was." Defendant summed up his argument by asserting that:

> "If [the officer's] purpose of the investigation was really to investigate a witness, as he testified, through his own testimony in [the officer's] mind [the defendant] wasn't really free to leave because he was a witness, so I'd argue that you could extrapolate from the officer's testimony that in his mind [defendant] wasn't free to leave, and therefore it's reasonable that there may have been some sort of instruction that [defendant] stay behind so that he could be questioned as a witness.

> "* * * * *

> "We have an officer who is—has the ability, I would argue he did have the ability to ask my client if he knew the codefendant and if he knew what her identity was, but he did not have the ability to ask if there were weapons or contraband and that—

> "THE COURT: But isn't that the one thing that the statute says he can ask?

> "[DEFENDANT]: The statute says that they can—

> "THE COURT: That's 810.410(3)(d).

> "[DEFENDANT]: Right, the 810.410(3) is actually mentioned in the [*State v.*] *Thompkin*[, 341 Or 368, 143 P3d 530 (2006),] case, and it says if they have reasonable suspicion of criminal activity, they can question her regarding drugs, but there was no reasonable suspicion of that criminal activity in—there wasn't that reasonable suspicion * * * to allow [the officer] to ask that question, just as with the *Thompkin* case[.]

> "* * * * *

> "I think where this ends is that there was a stop and there was a request for search without reasonable suspicion that a crime could have been committed when that request was made and [defendant] disclosed a pocketknife."

The prosecutor replied that there had been no show of authority to suggest that defendant was not free to leave and that defendant could have left during the time he was sitting, unattended, in the car while the deputy was attempting to determine the driver's identity. Moreover, the prosecutor argued, the deputy lawfully approached defendant as part of the deputy's investigation into the driver's identity. The deputy's inquiry of defendant about weapons or contraband, according to the prosecutor, was justified by ORS 810.410, and, therefore, defendant's consent to a search of his person following his answer to the deputy's question was the result of a chain of lawful contacts, and not the result of an illegal seizure. Alternatively, the prosecutor argued that the deputy's question was justified on officer safety grounds because defendant had been left unattended in the car "where he was with lots of bags, and he was moving about, which caused concern to the officer in terms of possibly being able to have gotten a weapon." The prosecutor concluded by arguing that defendant could have, at any time during the encounter, chosen to walk away.

The trial court denied defendant's motion to suppress, and gave the following reasons for its denial:

> "Okay. Well, I don't find that [defendant] did anything while he was left alone in the car that really led the officer to believe that [defendant] was anymore * * * dangerous than anybody else would be in that particular situation. I mean, anybody would turn around and look and see what was going on with your—the person who was driving the car and the police officer, and then turn back, and there would be a little movement, and there was nothing extraordinary in this case.

> "I do find that in the legal sense, as opposed to the Newtonian sense, physics, that [defendant] wasn't stopped when the car was stopped, and when the officer asked him to—if he would get out of the car and talk to him, that wasn't * * * under Oregon or federal law a show of authority that would amount to a stop.[1]

---

[1] We note here that, although the trial court was correct in making this statement when it did—May 23, 2007—the contention that defendant was not seized when the car was stopped is no longer a correct statement under the Fourth Amendment to the United States Constitution. *See Brendlin v. California*, 551 US

"And when the officer—the officer had the right under statute to ask about weapons, which he did, weapons and contraband, and I think what distinguishes this case from the [*Thompkin*] case is that in the [*Thompkin*] case they got the crack pipe, they're holding onto it for a while, and then they require the woman—I think they were running her I.D., they're doing a records check on her, as well, which is under Oregon case law much more stop-like that what this situation was.

"So the officer asks him to step in the back and talk. The first question the deputy asks is, 'Got any weapons or contraband,' which he has the right to ask under the statute. Then he gets consent to search for the weapon, finds the meth, and here we are.

"So I find that the deputy did everything by the book, there was no illegal stop, so I have to deny the motion to suppress."

Defendant then waived his right to a jury trial, and the court convicted him after a trial on stipulated facts. This appeal followed.

■ Defendant renews his arguments on appeal. As noted, the dispositive issue is whether, under Article I, section 9, the officer impermissibly seized defendant when, after having completed his investigation and arrest of the driver, he contacted defendant and requested that he get out of the car.

In *State v. Foster*, 139 Or App 303, 305, 912 P2d 377, *rev den*, 323 Or 691 (1996), the defendant was a passenger in a car that was lawfully stopped for driving without a rear license plate light. The officer arrested the driver for a parole violation and placed the driver in the back seat of his police cruiser. The officer then walked back to the car, contacted the

---

249, 127 S Ct 2400, 2404, 168 L Ed 2d 132 (2007) (holding, for purposes of the Fourth Amendment, that passengers are seized when a car is stopped because they are subject to the same show of authority that the driver is subject to, and, accordingly, no reasonable passenger would feel free to leave without police permission). Because defendant did not preserve a Fourth Amendment claim, we do not apply *Brendlin* in this case; under Article I, section 9, a passenger is not seized when the vehicle he or she is riding in is stopped. *State v. Amaya*, 336 Or 616, 630-31, 89 P3d 1163 (2004) ("It is a truism that all passengers in a validly stopped car have been 'stopped,' at least physically. However, such a stop is not a 'seizure' of those passengers for constitutional purposes.").

defendant and asked him to get out of the car; he did, and the officer then asked for consent to search the car, which the defendant gave. That search turned up evidence of controlled substances, and the defendant was arrested. The officer testified that he had asked the defendant for consent to search the car because he suspected that the defendant was engaged in drug crimes, because the driver's underlying conviction had been for possession of controlled substances. *Id.* Relying on the Supreme Court's interpretation of ORS 810.410 in *State v. Dominguez-Martinez*, 321 Or 206, 895 P2d 306 (1995), we held that, absent some other justification, after a traffic stop ends, an officer lacks authority to detain and question persons stopped for the traffic infraction. *Foster*, 139 Or App at 306. Accordingly, in that case, because the stop for the traffic infraction had ended when the officer had arrested the driver and placed her in the patrol car, the officer needed a basis other than the traffic infraction to detain and question the defendant. *Id.* at 307. We rejected the trial court's reliance on the officer's knowledge of the driver's prior drug conviction, concluding that that alone did not provide a basis for the officer to detain and question the defendant. *Id.*; *see also State v. Taylor*, 151 Or App 687, 691, 950 P2d 930, *rev den*, 327 Or 432 (1997) ("We conclude that a police officer has no authority to question or search passengers of a stopped vehicle after the officer has resolved the investigation of the infraction that led to the stop unless the officer is acting pursuant to an independent source of authority.").

This case is akin to *Foster*. Here, the traffic infraction that led to the car being stopped was an illegal turn. When the deputy contacted the driver, the driver admitted that she believed her license to be suspended, and the deputy initiated an investigation into that offense. That investigation—including the officer's authority to question defendant pursuant to ORS 810.410—concluded when the deputy arrested the driver and placed her in the back of his police cruiser *See Taylor*, 151 Or App 687. From that point forward, the officer was required to have some independent basis for detaining defendant.

In this case, although the deputy testified that he approached defendant to ask him about the driver's identity as part of his investigation of the driver, the deputy did not

ask defendant that question until *after* he had asked defendant to get out of the car, asked him whether he had any drugs or weapons, and obtained his consent to a search. The deputy's stated justification for approaching defendant is simply not relevant to our determination of whether the deputy seized defendant by asking him to get out of the car and then asking him about drugs and weapons. *See State v. Ainsworth*, 310 Or 613, 621, 801 P2d 749 (1990) ("Article I, section 9, prohibits certain governmental action, not certain governmental states of mind. The Oregon Constitution does not require an inquiry into the observing officer's thoughts to determine whether the officer's conduct unconstitutionally violates a defendant's Article I, section 9, rights."); *see also State v. Hall*, 339 Or 7, 29 n 16, 115 P3d 908 (2005) (same). Regardless of the deputy's assertion that he approached defendant as part of his investigation of the driver—an investigation that had ended by that point in the encounter—the first contact the deputy had with defendant was his request that defendant get out and come to the rear of the car and speak with him; moreover, that request was immediately followed by an inquiry into drugs and weapons. Again, because the deputy's authority to question defendant had dissipated by virtue of his completion of his investigation of the driver, the deputy needed to have an independent legal justification for his subsequent actions—specifically, reasonable suspicion that defendant had committed or was about to commit a crime. We conclude that he did not.

■    As the deputy testified, he asked defendant whether he had any drugs or weapons because

> "the defendant and the [driver], they had sores on their face, which is typical of someone that's been using a controlled substance, such as methamphetamine, as well as after I had already contacted [the driver] and found marijuana on her, people that—not a really nice way to put it—people that use drugs tend to carry knives and weapons, not to mention most people—in my experience people that—if someone uses drugs, their friends are going to use drugs, as well."

As in *Foster*, the mere fact that the driver here was involved with controlled substances is not enough to support a reasonable suspicion that defendant was involved in criminal activity, and the deputy's observation of sores on defendant's face

also fails to provide a basis for reasonable suspicion. *See, e.g.,* *State v. Rodgers,* 219 Or App 366, 373, 182 P3d 209, *rev allowed,* 345 Or 301 (2008) (implicitly accepting state's concession that presence of sores on the defendant's face could not support a reasonable suspicion that the defendant possessed methamphetamine). Accordingly, when the deputy returned to the car and asked defendant to get out and speak with him, he had completed his investigation into the traffic violation by arresting the driver, and he lacked independent reasonable suspicion that defendant was involved in criminal activity. The question then reduces to whether the deputy's conduct constituted an unjustified seizure of defendant, or was, as the trial court concluded, not "under Oregon * * * law a show of authority that would amount to a stop."

In *State v. Holmes,* 311 Or 400, 409-10, 813 P2d 28 (1991), the Supreme Court held that a person is "seized" for purposes of Article I, section 9, and therefore stopped,

"(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances."

In *Ashbaugh,* we explained the distinction between a *Holmes* type (a) and type (b) inquiry:

"The court determines whether a stop of the first type— type (a)—has occurred without reference to the subjective belief of the defendant; the only relevant state of mind is the officer's. A type (b) inquiry examines the defendant's subjective belief and then, if the necessary belief is found, evaluates its reasonableness. *State v. Toevs,* 327 Or 525, 535, 964 P2d 1007 (1998)."

225 Or App at 23. Consistently with the analysis in *Ashbaugh, see id.* at 24-25 (applying a *Holmes* type (b) inquiry), whether the encounter between the officer and defendant constituted a *Holmes* type (b) stop is determined by the methodology in *Toevs:*

" 'The court in *Holmes* held that a "seizure," which includes a stop, occurs under Article I, section 9, whenever a person *subjectively* believes that a law enforcement officer significantly has restricted or interfered with that person's liberty or freedom of movement and such a belief is *objectively reasonable* under the circumstances.' "

*Ashbaugh*, 225 Or App at 24 (quoting *Toevs*, 327 Or at 535; emphasis in original).

■ As we explained in *State v. Parker*, 225 Or App 610, 614-15, 202 P3d 205, *adh'd to as modified on recons*, 227 Or App 413, 206 P3d 259 (2009), a *Holmes* type (b) inquiry implicates both subjective and objective components—that is, whether the defendant subjectively believed that he or she was significantly restrained and, if so, whether that belief was objectively reasonable. As the party bearing the burden of demonstrating the lawfulness of the search, the state can prevail against a *Holmes* type (b) based motion to suppress if it disproves either of those conjunctive components. That is, the state can prevail by proving either (1) that the defendant did not believe that the officer had significantly restrained or interfered with the defendant's freedom of movement, or (2) that such a belief would not be objectively reasonable. *Ashbaugh*, 225 Or App at 24. In assessing whether "such a belief is objectively reasonable under the circumstances," the operative inquiry is whether "a reasonable person in defendant's position could have believed that the officers significantly had restricted [her] liberty or freedom of movement." *Id.* at 25 (internal quotation marks and emphasis omitted; brackets in original).

We begin with the objective component because, if the state were to prevail on that component, that would obviate the need for a remand. *Parker*, 225 Or App at 615. We conclude for the following reasons that, in the totality of the circumstances in this case, a reasonable person in defendant's position could have believed that the deputy had exercised authority over his freedom of movement when the deputy asked defendant to get out of his vehicle; that was an exercise of authority that implicated his rights under Article I, section 9, and, accordingly, must have been based on a reasonable suspicion that he had committed or was about to

commit criminal conduct. *Hall*, 339 Or at 15. In that regard, we emphasize that the controlling inquiry is not whether every reasonable person would have so believed, but, instead, whether a reasonable person could have so believed. *Parker*, 225 Or App at 615.

At the time the deputy asked defendant to get out of the car, a second deputy had arrived and was standing "a few feet" behind the deputy; defendant was asked not only to get out of the car, but also to walk to the rear of the car to speak with the deputy. According to the deputy's testimony, he did not tell defendant that he was free to go, and there is no evidence in the record showing that the deputy made defendant aware that he was being approached simply as part of the deputy's investigation of the driver. Indeed, the deputy said nothing to defendant to indicate that he himself was not the target of a criminal investigation. Thus, if defendant believed that he was not free to leave when the deputy asked him to get out the car, that belief was reasonable.

On this record, we are unable to determine whether defendant held such a belief. Although the state argues that we should infer from the court's denial of defendant's motion that the court *implicitly* found that defendant did not subjectively believe that he was seized, we decline to do so. The trial court made no findings regarding defendant's subjective belief that he had been seized. Rather, the court merely noted that defendant was not "stopped," in the legal sense, either when the car was pulled over or when the deputy asked him to get out of the car. That omission thwarts our ability to infer factual findings from the trial court's ultimate legal conclusion. Unlike in *State v. Astorga*, 225 Or App 42, 47, 200 P3d 170 (2008), *rev den*, 346 Or 361 (2009), where we applied the presumption from *Ball v. Gladden*, 250 Or 485, 488, 443 P2d 621 (1968), in the absence of an express finding of defendant's subjective belief, here, the trial court failed to completely analyze the relevant portion of defendant's encounter with the police. *Cf. Astorga*, 225 Or App at 47 ("[A]lthough the trial court did not make an express finding of fact regarding defendant's state of mind, the record shows that the court applied the correct definition of 'stop' and reached the conclusion that a stop occurred * * *. The court could not have reached that

legal conclusion unless it had implicitly resolved any ambiguity regarding defendant's subjective belief * * *.").

Accordingly, we remand to the trial court for such a determination.[2] If the court finds that defendant did not believe that he was the subject of a criminal investigation and was therefore unable to leave, the court should reinstate defendant's conviction. If the court determines that defendant did subjectively hold that belief, however, the evidence at issue must be suppressed.

Vacated and remanded for further proceedings.

---

[2] We emphasize that our remand on that issue should not be construed as suggesting that a defendant must, or should, testify as to his or her subjective belief. A defendant's subjective believe may, in appropriate circumstances, be inferred from other evidence. In this case, as emphasized above, we are constrained from applying the presumption in *Ball*—that the trial court, in denying his motion to suppress, implicitly found that defendant believed he was free to go—*not* because of an absence of evidence in the record, but because the trial court here did not analyze the portion of the encounter we consider to be dispositive. Our remand provides the court with the opportunity to do so.