Argued and submitted January 29, vacated and remanded for further proceedings
November 4, 2009

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## STEVEN NICHOLAS BACKSTRAND,
*Defendant-Appellant.*

Washington County Circuit Court
C071116CR; A136163

220 P3d 748

Neil F. Byl, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Linda Wicks, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Rosenblum, Judge, and Deits, Senior Judge.

ROSENBLUM, J.

Haselton, P. J., concurring.

Deits, S. J., dissenting.

## ROSENBLUM, J.

Following a trial to the court, defendant was convicted of misdemeanor driving while revoked. ORS 811.182. He makes two assignments of error on appeal. In the first, he assigns error to the trial court's denial of his motion to suppress evidence of his identity and the fact that his driver's license had been revoked, arguing that the arresting officer learned that information as a result of illegally stopping defendant without reasonable suspicion. In his second assignment of error, which defendant concedes is unpreserved, he argues that the charging instrument did not allege facts sufficient to establish the crime of misdemeanor driving while revoked. We reject defendant's second assignment of error without discussion. With respect to the first assignment of error, we conclude that the trial court erred in ruling that a reasonable person in defendant's circumstances would not have believed that he or she had been stopped. Because the court did not address whether defendant subjectively believed that his liberty had been restrained, we remand for further proceedings.

Because defendant was convicted, we view the facts in the light most favorable to the state. *State v. Cervantes*, 319 Or 121, 125, 873 P2d 316 (1994). Deputy Gerba of the Washington County Sheriff's Department was in his patrol car, observing an adult bookstore that had been the subject of three recent armed robberies. He went inside the store to conduct a security check. While in the store, he saw defendant and his girlfriend. Both of them looked young to Gerba, so he asked them how old they were. Gerba did not suspect them of any wrongdoing, but he was concerned that the store owner could have been violating ORS 167.065, which prohibits furnishing obscene materials to minors. Defendant told Gerba that he was 22. Gerba asked him if he had any identification. Both defendant and his girlfriend produced their identification. Gerba took the cards and called dispatch with the identification numbers on them. Gerba testified that he called dispatch with the information in order to ensure that the identification cards were genuine. He explained, "When somebody has a fake ID, if we run it, it comes back unable to locate." After calling the information to dispatch, he returned the cards, said, "Have a good day," and left the store. He

had retained the identification cards for a total of 10 to 15 seconds.

As he was leaving, dispatch called back and informed Gerba that defendant's driver's license had been suspended. Gerba thought nothing of that fact at the time. He went back to his patrol car and continued to observe the store in connection with its security issues. A few minutes later, he saw defendant and his girlfriend leave the store and drive away. Defendant was driving. Gerba pulled them over and arrested defendant for driving while suspended.

Although dispatch told Gerba that defendant's license had been suspended, it had actually been revoked, so defendant was charged with driving while revoked. Before trial, defendant filed a motion to suppress all evidence that was the product of his encounter with Gerba in the store. He argued that, by calling his identification information in to dispatch in his presence, Gerba had stopped him. Defendant argued that his case was analogous to *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), in which the Supreme Court held that the defendant was stopped when a police officer asked for his identification and then requested a warrant check in his presence. Because Gerba lacked reasonable suspicion that defendant was involved in any criminal activity, defendant contended that the stop was unlawful.

The trial court denied the motion to suppress. It stated, "I accept the deputy's testimony that he wasn't investigating this defendant for any wrongdoing. He was investigating whether the store was violating the statute [prohibiting furnishing obscene materials to minors]. So actually, he was investigating whether this gentleman, the defendant, was a victim of a crime." In the court's view, a crime victim "would think they would do some sort of investigation to see if you were a victim * * *." The court stated that, in an analogous case in which the person was suspected of a crime, it would "probably say it's an invalid stop," but, because the encounter was a "minim[al] intervention to see if [defendant was] a victim," the analysis in *Hall* did not apply. It therefore concluded that Gerba had not stopped defendant, and it denied the motion.

Defendant waived the right to a jury trial, and he agreed that the court could consider, for trial purposes, the

evidence presented in the suppression hearing. In addition to that evidence, the state offered, and the court admitted, certified records from Driver and Motor Vehicle Services showing that defendant's license had indeed been revoked. The court then convicted defendant.

On appeal, defendant renews his contention that Gerba stopped him without reasonable suspicion and learned his identity and that his license had been revoked only as a result of the stop. In response, the state first argues that defendant's interaction with Gerba did not amount to a stop. The state notes that, unlike in cases such as *Hall*, in which the police ran a warrant check in the defendant's presence, here, Gerba "merely called in the ID number to check if it was valid—not to determine if defendant was a wanted criminal—and promptly gave defendant back his ID" and ended the encounter. In the state's view, Gerba did not intentionally and significantly interfere with defendant's liberty of movement, and a reasonable person would not have believed that he had. The state goes on to argue that, even if defendant was stopped, the evidence that he seeks to suppress was not a product of the stop. In support of that argument, the state contends that (1) defendant failed to show a "minimal factual nexus" between the stop and the evidence that he seeks to suppress; (2) the evidence was available from an independent source; and (3) the connection between the stop and the evidence is so attenuated that the stop cannot properly be viewed as the source of the evidence.

The first question before us is whether Gerba stopped defendant. To be lawful, a stop must be justified by reasonable suspicion of criminal activity. *State v. Toevs*, 327 Or 525, 534, 964 P2d 1007 (1998). It is undisputed that Gerba did not suspect that defendant was involved in criminal activity. Thus, if Gerba stopped defendant, the stop constituted an unlawful seizure. For purposes of Article I, section 9, of the Oregon Constitution, a stop occurs "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances." *State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991). Police conduct interfering with a person's liberty of movement may

take the form of either physical force or a show of authority. *State v. Juarez-Godinez*, 326 Or 1, 6, 942 P2d 772 (1997). A show of authority effects a stop if it leads the person to subjectively believe that he or she is not free to leave and that belief is objectively reasonable. *State v. Ruiz*, 196 Or App 324, 327, 101 P3d 824 (2004), *rev den*, 338 Or 363 (2005). Determining whether a stop has occurred requires a "fact-specific inquiry into the totality of the circumstances of the particular case." *Holmes*, 311 Or at 408.

As noted, the trial court concluded that a reasonable person would not view a brief detention to determine whether he or she is a crime victim as a significant intrusion on his or her liberty. Under the circumstances here, however, a reasonable person would not necessarily have believed that he or she was regarded solely as a potential victim. That is, even if a reasonable person would have understood that Gerba's initial concern was that the store owner may have been furnishing obscene materials to minors, such a person could have believed that Gerba was also investigating whether defendant and his girlfriend had given him false identification or whether there were any outstanding warrants for their arrest. There would seem to be no reason for Gerba to call dispatch with the ID numbers other than to determine the authenticity of the cards or to conduct a warrant check. Although Gerba's subsequent actions demonstrated that he was not going to require defendant and his girlfriend to wait for the results of that inquiry to dispatch, until he told them "Have a nice day" and walked away, a reasonable person in the same circumstances could have believed that he or she was not free to leave. Thus, although the encounter was brief, a reasonable person could have viewed it as a stop.

■ The question remains whether defendant subjectively believed that he was not free to leave. The trial court did not make a finding on that issue. It follows that we must remand for such a determination.[1]

_____

[1] We may not apply the presumption from *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968), that, in denying defendant's motion to suppress, the trial court implicitly found that defendant believed he was free to leave. We are so constrained not because of an absence of evidence in the record, but because it is clear that the court's ruling was based on the "objectively reasonable" prong of the *Holmes*

■ The state argues that we need not remand, contending that, even if Gerba stopped defendant, the evidence that defendant seeks to suppress is not a product of the stop. For purposes of analyzing that argument, the encounter is presumed to have been a stop, and this opinion refers to it as such, with the understanding that, depending on the trial court's findings on remand, it may not actually have been a seizure within the meaning of Article I, section 9.

■■ For evidence to be suppressed as a product of police illegality, a defendant must establish "a minimal factual nexus—that is, at minimum, the existence of a 'but for' relationship—between the evidence sought to be suppressed and prior unlawful police conduct * * *." *Hall*, 339 Or at 25. If the defendant succeeds, the state may nevertheless show that the evidence is admissible by proving that it did not derive from the police illegality.

> "To make that showing, the state must prove that either (1) the police inevitably would have obtained the disputed evidence through lawful procedures even without the violation of the defendant's rights under Article I, section 9; (2) the police obtained the disputed evidence independently of the violation of the defendant's rights under Article I, section 9; or (3) the preceding violation of the defendant's rights under Article I, section 9, has such a tenuous factual link to the disputed evidence that that unlawful police conduct cannot be viewed properly as the source of that evidence."

*Id.* (citations omitted).

As noted above, the state first contends that defendant failed to establish a factual nexus between the stop and the evidence. According to the state, assuming—as defendant argues—that the stop began at the moment that Gerba called defendant's identification number to dispatch, the officer already had the information that enabled him to determine that defendant's driving privileges were revoked—namely, defendant's name and ID number. Thus, in the state's view, Gerba did not obtain any evidence as a result of the stop.

analysis, and the court has not yet completely analyzed the issue of defendant's subjective intent. *See State v. Lantzsch*, 229 Or App 505, 516, 214 P3d 22 (2009).

The state is correct with respect to evidence of defendant's identity. Defendant voluntarily produced his ID card and gave it to Gerba before the stop began. Whether Gerba actually read the information on the ID card before calling it in is irrelevant. Gerba may have internalized the information simultaneously with the commencement of the stop, but he did not obtain it as a result of the stop. Therefore, that evidence of defendant's identity is not subject to suppression.[2]

The state is incorrect, however, with respect to the evidence that came to light after the stop began. Even though defendant gave Gerba the ID card before Gerba called the information in, but for the act of calling it in—the very act that effected the stop—Gerba would not have known that defendant's license had been revoked. The call to dispatch is an essential factual link between Gerba's obtaining defendant's name and ID number and his discovery that defendant's license had been revoked. But for that discovery, Gerba would not have known that defendant was driving illegally when he left the store. It follows that he also would not have arrested defendant and that the state would not have obtained the DMV records that were taken into evidence at defendant's trial. In other words, but for the stop, none of the evidence (other than defendant's identity) would have come to light. Therefore, defendant established the necessary factual nexus between the stop and the evidence obtained after the stop began.

---

[2] As defendant notes, in *State v. Starr*, 91 Or App 267, 754 P2d 618 (1988), we held that the defendant's identity was obtained as a result of an unlawful stop in circumstances similar to those here. Without reasonable suspicion that the defendant was involved in criminal activity, a police officer asked the defendant for his driver's license. He retained the license for five to 10 minutes before returning it. After the defendant left, the officer ran a records check and discovered that the defendant's license was suspended. He followed the defendant and arrested him for driving while suspended. The trial court ruled that an unlawful stop began when the officer first asked the defendant for his license, and it suppressed all of the evidence obtained after that point, including the defendant's identity. *Id.* at 269. On the state's appeal, we disagreed that the stop began with the officer's request, but concluded that he had retained the license long enough for the encounter to amount to a stop. *Id.* at 270. We affirmed the suppression ruling, holding that the "defendant's identity was obtained as a result of the unlawful stop" because the officer "did not have authority to compel [the] defendant to do anything, including giving his name." *Id.* However, the state did not argue, as it does here, that, because the defendant voluntarily gave the officer his license before the stop began, evidence of his identity was not a product of the stop. Because we did not consider that position in *Starr*, the case is not controlling here.

■ The state next argues that that evidence did not derive from the stop, because it was available from an independent source—again, because Gerba already had obtained defendant's name and ID number before the stop began. The state essentially recasts its "factual nexus" argument as an "independent source" argument. The state's argument remains unpersuasive. Although Gerba obtained defendant's name and ID number before the stop began, his discovery of the fact that defendant's license had been revoked did not flow from that information independently of the stop. The "independent source" exception to the exclusionary rule applies when the police *"did in fact* acquire certain evidence by reliance upon an untainted source[.]" Wayne R. LaFave, 5 *Search and Seizure* § 11.4(a), 241 (3d ed 1996) (emphasis added). Thus, the fact that the evidence in question was available from an independent source—because Gerba *could have* conducted the same records check without stopping defendant—is irrelevant. Again, but for the stop, defendant's name and ID number would not have led to Gerba's discovery of the fact that defendant's license had been revoked or his awareness that defendant was driving illegally. Evidence of those facts thus cannot be said to be independent of the stop.

■ The state finally argues that the connection between the stop and the evidence in question is so attenuated that the stop cannot properly be viewed as the source of the evidence. The state asserts that Gerba's knowledge that defendant's license had been revoked had no evidentiary significance before Gerba saw defendant get into a car and drive away. In the state's view, only that intervening act by defendant "transformed that inconsequential piece of information into evidence of a crime." The state contends that the facts here are analogous to the discovery of an outstanding arrest warrant for the defendant, which operates to attenuate the taint of prior illegal police conduct.

The state does not explain why evidence obtained by illegal police conduct is attenuated from that conduct merely because the police are not aware of its evidentiary significance when they obtain it. Although the stop by itself did not produce sufficient information to prompt Gerba to arrest defendant, the information that the stop *did* produce was an essential factor in his decision to arrest defendant. Thus, it

cannot be said that the stop was not the source of the evidence that defendant was driving while revoked. *See Hall*, 339 Or at 25 (evidence is not subject to suppression if "the preceding violation of the defendant's rights under Article I, section 9, has such a tenuous factual link to the disputed evidence that that unlawful police conduct cannot be viewed properly as the source of that evidence" (citation omitted)).

This case is not analogous to those in which the police discovered an outstanding arrest warrant after illegally stopping the defendant. The line of cases on which the state relies began with *State v. Dempster*, 248 Or 404, 434 P2d 746 (1967). In that case, the Supreme Court explained that an outstanding arrest warrant can serve to attenuate the link between a police illegality and evidence discovered thereafter because, once the warrant is discovered, the police are bound to obey its command and arrest the defendant. *Id.* at 407-08. In circumstances such as those in the *Dempster* line of cases, an outstanding arrest warrant is based on information that was unquestionably obtained by the state independently of the illegal stop—given that the warrant was already outstanding when the stop occurred—and has already been judicially determined to establish probable cause to arrest the person named in the warrant. Any search incident to the lawful arrest on the warrant is thus purged of the taint of the earlier police illegality. For that reason, even though the police would not have discovered the warrant but for the illegal stop, evidence that the police discover after the warrant is executed is attenuated from the illegal stop.

In this case, there was no similar command to arrest defendant that Gerba was bound to obey. Moreover, unlike the information leading to the issuance of the arrest warrants in the *Dempster* line of cases, at least some of the information that formed Gerba's decision to arrest defendant was a direct product of the initial stop. The intervening circumstance on which the state relies—defendant's driving away from the store—did not, by itself, provide a sufficient basis for Gerba to arrest him. In *Dempster*, on the other hand, the intervening circumstance that created the attenuation—the arrest warrant—*did* by itself provide a sufficient basis for arresting the defendant. The state's argument that this case is analogous to *Dempster* therefore fails.

■ The concurring opinion contends that, if the stop did not begin until Gerba called dispatch, defendant suffered no constitutionally cognizable detriment from the stop, so suppression is not required. The dissent agrees with that aspect of the concurring opinion. The concurrence rightly asserts that our analysis must be consistent with the principle that evidence is not subject to suppression if "the defendant is not placed in a worse position than if the governmental officers had acted within the bounds of the law." *Hall*, 339 Or at 25. The approach taken by the concurrence, however, goes astray in two respects. First, in determining whether defendant was placed at a disadvantage, it focuses on the circumstances of Gerba's conduct rather than the conduct itself. The concurrence notes that, under the reasoning reflected in this opinion, defendant's presence during the call to dispatch is the circumstance that transformed otherwise lawful police conduct into an unlawful stop. 231 Or App at 642 (Haselton, P. J., concurring). From there, it argues that "defendant was not placed in any constitutionally cognizable 'disadvantage' *vis-à-vis* his ultimate arrest *because of that circumstance.*" *Id.* at 642 (emphasis added) (Haselton, P. J., concurring). The question is not whether a defendant is disadvantaged by the *circumstances* that render police conduct illegal, but whether he or she is disadvantaged by the *conduct* that the police engaged in—in this case, calling dispatch with defendant's identification information.

Second, the concurrence goes astray when comparing defendant's position to the position he would have been in had the illegal conduct not occurred. It contends that "defendant was 'not placed in a worse position' with respect to his arrest than if Gerba 'had acted within the bounds of the law' by contacting dispatch out of defendant's presence." *Id.* at 642 (quoting *Hall*, 339 Or at 25) (Haselton, P. J., concurring). But the concurrence does not consider the position defendant would be in had Gerba simply refrained from engaging in the conduct that violated defendant's constitutional rights. Rather, it considers the position defendant would be in had Gerba done something different—namely, calling dispatch later, when defendant was no longer in his presence. In many search and seizure cases involving illegal police action, we likely could say that the police could have taken a different

course of action—one that remained "within the bounds of the law"—and obtained the same evidence. It is inappropriate to determine the defendant's relative position by considering hypothetical lawful conduct that the police could have engaged in (but did not) or hypothetical circumstances that would have rendered the police conduct lawful (but which were not present). Rather, the defendant's relative position should be determined by considering the position he or she would be in had the police refrained from engaging in the unlawful conduct, without speculating about what the police might lawfully have done thereafter.

Under the circumstances of this case, calling dispatch with defendant's identification information was (presumably, for present purposes) illegal. In determining whether the evidence should be suppressed, we must consider the position defendant would be in had Gerba not done that, without regard to anything else that Gerba *might* have done. The answer is obvious: Had Gerba not called dispatch, he would not have discovered that defendant's license had been revoked, he would not have known that defendant was driving illegally, and he would not have arrested defendant. In short, this case would not have been brought against defendant had Gerba not made the call to dispatch. Defendant was clearly "placed in a worse position" by Gerba's having acted outside the bounds of the law. Respectfully, the conclusion reached by the concurrence and the dissent is incorrect.

To summarize, regardless of whether Gerba stopped defendant or not, the trial court correctly ruled that evidence of defendant's identity is not subject to suppression. If defendant was in fact stopped, however, the stop was unlawful and evidence of the facts that defendant's license had been revoked and that he was driving illegally was tainted by the unlawful stop. On remand, the trial court shall determine whether defendant subjectively believed that he was not free to leave when Gerba called dispatch with his identification information. If the court finds that defendant did not hold that belief, it should reinstate defendant's conviction. If it finds that he did hold that belief, the evidence must be suppressed.

Vacated and remanded for further proceedings.

**HASELTON, P. J.,** concurring.

The trial court erred in denying suppression, but not for the reasons advanced by Judge Rosenblum in the lead opinion. Our dispute turns on the timing of the operative "stop."[1]

The lead opinion rests on the premise that the stop did not occur until Deputy Gerba actually contacted dispatch. *See* 231 Or App at 628 (characterizing Gerba's call to dispatch as "the very act that effected the stop"). However, as amplified below, if the stop began at that point, there would be no basis for suppression under *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), because no inculpatory information was obtained from defendant, by way of questioning, consent, or observation, during or immediately after the stop.

Conversely, in my view, the stop began earlier—when, in response to Gerba's inquiries, defendant produced, and Gerba took, defendant's driver's license. At *that* point, "in the totality of the circumstances * * * 'a reasonable person in defendant's position could have believed' that he was not free to go." *State v. Parker*, 225 Or App 610, 615, 202 P3d 205, *adh'd to as modified on recons*, 227 Or App 413, 206 P3d 259 (2009) (quoting *State v. Toevs*, 327 Or 525, 536, 964 P2d 1007 (1998)); *see also State v. Ashbaugh*, 225 Or App 16, 24-25, 200 P3d 149 (2008), *rev allowed*, 346 Or 257 (2009). And it was at *that* point—before Gerba ever contacted dispatch—that Gerba obtained ultimately inculpatory information from defendant, *viz.*, defendant's identification and date of birth, which, in turn, yielded the information that defendant's driving privileges had been suspended. Consequently, unless the trial court determines on remand that defendant did not subjectively believe that his freedom of movement had been

---

[1] I fully appreciate that, in this procedural posture, my use of "stop" ostensibly begs the question. After all, both Judge Rosenblum and I agree that the ultimate determination of whether defendant was stopped will depend on the trial court's finding on remand regarding defendant's subjective belief as to whether his freedom of movement had been significantly impaired. *See, e.g., State v. Parker*, 225 Or App 610, 616-17, 202 P3d 205, *adh'd to as modified on recons*, 227 Or App 413, 206 P3d 259 (2009); *State v. Ashbaugh*, 225 Or App 16, 28, 200 P3d 149 (2008), *rev allowed*, 346 Or 257 (2009). Still, "stop" is unavoidable, and useful, shorthand in this context.

significantly restrained, *see, e.g., Ashbaugh*, suppression is required.

At first blush, that distinction with respect to the timing of the operative stop may seem to be academic, perhaps even metaphysical—after all, defendant was stopped, and the difference is a matter of only a few seconds. However, that distinction has profound implications regarding *Hall*'s proper application, which I will endeavor to explain below. *See* 231 Or App at 641-42 (Haselton, P. J., concurring).

The facts material to our review of the trial court's denial of suppression are undisputed and straightforward. Defendant and his girlfriend, Rodriguez, were shopping late at night in an adult novelty and book store. That establishment was posted as excluding anyone under the age of 18. Gerba, who was on patrol (and, thus, presumably was in full uniform), entered the store and, immediately upon seeing defendant and Rodriguez, "contacted" them because "on the door it says you've got to be 18 or older." Gerba asked defendant and Rodriguez how old they were, and defendant replied that he was 22 years old. Gerba, who was unsatisfied with that response because "he looked pretty young to me," then asked defendant and Rodriguez if they had any identification. In response, defendant and Rodriguez then handed their driver's licenses to Gerba, who took them and retained them for 10 to 15 seconds, during which he contacted dispatch, which "[r]an the numbers." Gerba did so to confirm that defendant's and Rodriguez's licenses were genuine, not "fake." Gerba then returned the licenses and said, "[H]ave a good day."

Gerba then left the store and, immediately thereafter, dispatch responded that defendant's identification was genuine but his driving privileges had been suspended. Gerba returned to his patrol car and continued to watch the store for security purposes. About five minutes later, he saw defendant and Rodriguez come out of the store and get into a car, with defendant driving. Based on the information obtained from dispatch, Gerba stopped and arrested defendant for driving while suspended.

Defendant was subsequently charged with misdemeanor driving while revoked, ORS 811.182.[2] Defendant moved to suppress all evidence that was the product of his encounter with Gerba in the store—including his identity and date of birth, dispatch's consequent communication to Gerba that defendant's driving privileges had been "suspended," and the arrest that was predicated on that information. The trial court denied suppression and convicted defendant.

On appeal, as before the trial court, the dispute centers on suppression. As framed by the parties, the proper disposition of this case—as in the entire genre of post-*Hall* cases—requires consideration of three ultimately interrelated questions: (1) Was defendant unlawfully stopped? (2) If so, when? (3) Was the unlawful stop so related to inculpatory evidence that the constitution—here, defendant invoked only Article I, section 9, of the Oregon Constitution—compels suppression of that evidence?[3]

I begin with the first two, interrelated questions of whether, and when, defendant was unlawfully stopped. The question of timing here is especially critical because, with respect to defendant's ultimate arrest, the only inculpatory information that Gerba obtained from defendant, by questioning, consent, or observation, was defendant's name and date of birth, which Gerba did not know until he took and inspected defendant's driver's license. Thus, if defendant were unlawfully stopped at the time that Gerba took his license, that would be a quintessential *Hall* scenario, in which inculpatory information was elicited or obtained during or following an unlawful stop. Conversely, if the stop did not begin until thereafter, the circumstances would depart qualitatively from those within the standard *Hall* construct because the only inculpatory information elicited from defendant would have been obtained *before* the stop.

---

[2] Although dispatch told Gerba that defendant's driving privileges had been suspended, they had actually been revoked.

[3] I use the term "inculpatory" in its broadest sense of information that materially contributed to defendant's arrest.

Defendant (perhaps appreciating the importance of that distinction) argues that he was stopped "[a]t the moment [Gerba] took and retained defendant's ID for the purposes of calling his information into dispatch in defendant's presence." That contention appears to be based on either, or both, of two propositions: (1) An officer's mere physical receipt of a citizen's driver's license or similar identification in and of itself effects a stop, regardless of the attendant circumstances or how long the document is in the officer's possession. (2) Even if an officer's receipt and possession of a driver's license or identification does not *per se* effect a stop, in the totality of circumstances here, a person in defendant's position could, upon producing identification in response to an officer's inquiry, reasonably believe that he or she was not free to leave, at least until the document is returned.

To the extent that defendant is relying on some bare, *per se* notion of mere "physical receipt and possession," that contention is unavailing as incompatible with *Hall* and irreconcilable with our own pre-*Hall* precedent. If, in *Hall*, the officer's brief retention of the defendant's identification would have been sufficient, in and of itself, to effect a stop, the Supreme Court could easily have said so. But it didn't. Rather, the court emphasized the concurrence of the officer contacting dispatch for a warrants check. *Hall*, 339 Or at 19.

Further, we have repeatedly rejected arguments that an officer's physical receipt of a driver's license *per se* effects a stop. *See, e.g., State v. Woods*, 102 Or App 671, 675, 796 P2d 1209, *rev den*, 310 Or 422 (1990) (where the defendant, in response to officer's request, produced his driver's license and officer, after taking it, "wrote down the license information in his notebook and immediately handed it back to [the] defendant," "there had not been a sufficient show of authority to constitute a stop"); *State v. Jackson*, 91 Or App 425, 428, 755 P2d 732, *rev den*, 306 Or 661 (1988) (concluding that where, at officer's request, the defendant gave identification to officer and made inculpatory admissions that his license had been revoked before the officer ran a records check, inculpatory admissions were not made during the course of an unlawful stop because they antedated the officer's *"retention"* of the identification card for investigatory "record check purposes" (emphasis in original)); *accord State*

*v. Starr*, 91 Or App 267, 269-70, 754 P2d 618 (1988) (although officer's initial request for identification did not "transform the encounter into a stop," subsequent retention of the license for "five to ten minutes," "constituted a show of authority sufficient to lead a reasonable person to believe that he was not free to leave").

Nevertheless, I do agree with defendant's alternative, broadly contextual argument that, in the totality of the circumstances, the stop began when Gerba took defendant's identification. That is so because, although "*retention* of a suspect's identification, or the length of retention * * *, is not the touchstone of whether a stop has occurred," in this case, in the totality of the circumstances, an objectively reasonable person in defendant's position could have understood at that point that "he or she [was] under investigation and [was] not free to leave" until, at least, Gerba returned the license. *State v. Highley*, 219 Or App 100, 109, 180 P3d 1230 (2008), *rev pending* (2009).

The operative inquiry under *State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991), as construed in *Ashbaugh*, 225 Or App at 22-25, and amplified in *Parker*, is as follows:

> "[A] *Holmes* type (b) inquiry implicates conjunctive subjective and objective components—*viz.*, the defendant subjectively believed that he or she was significantly restrained and that belief was objectively reasonable. Consequently, as the party bearing the burden of demonstrating the lawfulness of the search, the state can prevail against a *Holmes* type (b)-based motion to suppress if it disproves either of those conjunctive components. That is, the state can prevail either (1) by proving that the defendant did not believe that the officer had significantly restrained or interfered with the defendant's freedom of movement or (2) if such a belief would not be objectively reasonable. [*Ashbaugh*, 225 Or App] at 24. In assessing whether 'such a belief is objectively reasonable under the circumstances,' the operative inquiry is whether ' "a reasonable person in defendant's position could have believed that the officers significantly had restricted [his or her] liberty or freedom of movement." ' [*Ashbaugh*, 225 Or App] at 25 (quoting *Toevs*, 327 Or at 536) * * *."

*Parker*, 225 Or App at 614-15 (emphasis omitted). *See also id.* at 615 (emphasizing that "the controlling inquiry" with respect to the objective component of the *Holmes* type (b) inquiry "is not whether *every* reasonable person *would* have so believed, but, instead, whether a reasonable person *could* have so believed" (emphasis in original)).

The circumstances here pertaining to the objective component of the *Holmes* type (b) inquiry are undisputed and straightforward: Defendant and his girlfriend were shopping in an adult bookstore, and the door to that store stated that persons under the age of 18 were excluded. Gerba, a uniformed officer, entered the store and, immediately upon seeing defendant and his girlfriend, asked defendant how old he was. When defendant responded that he was 22, Gerba obviously did not accept or believe that response. Instead, he asked defendant and his girlfriend if they had any identification. In response to that inquiry, they both produced driver's licenses, which Gerba then took.

Thus, this was not a case in which an officer merely requested and retained identification. Rather, in context—*viz.*, the store being posted so as to exclude persons under the age of 18, Gerba's immediate approach to the couple and questions about their ages, and his apparent disbelief of defendant's response—a person in defendant's position could reasonably have understood that Gerba was investigating him for some criminal activity (ostensibly, being underage in an adult bookstore).[4] A person in those circumstances could

---

[4] To be sure, as the state points out, there is no crime of being "underage in an adult bookstore" (or some functional equivalent). Rather, culpability under potentially applicable statutes runs solely against the owner, operator, or manager of such an establishment. *See, e.g.*, ORS 167.080 (a person commits the crime of displaying obscene materials to minors "if, being the owner, operator or manager of a business or acting in a managerial capacity, the person knowingly or recklessly permits [an unaccompanied] minor * * * to enter or remain on the premises" where various materials are "visibly displayed").

However, Gerba did not tell defendant and Rodriguez that his ostensible investigation pertained solely to the manager or proprietor of the establishment. Further, the statutes governing licensed establishments selling alcoholic beverages *do* provide that a person under the age of 21 is criminally liable if he or she "enter[s] or attempt[s] to enter any portion of a licensed premises that is posted or otherwise identified as being prohibited to the use of minors." ORS 471.430(3). Consequently, unless the "reasonable person" standard requires complete command of the Oregon Revised Statutes—which Gerba himself candidly acknowledged he did not have

also have understood reasonably that Gerba had requested the production of identification—and would seek to confirm the validity of that identification—as part of that continuing investigation. Consequently, a person in defendant's circumstances could reasonably have understood that, once Gerba took the identification, he or she would not be free to leave until, at least, the officer returned the identification.

The circumstances of this case are conceptually analogous to those in *State v. Zamora-Martinez*, 229 Or App 397, 211 P3d 349 (2009). There, we reversed the defendant's convictions for criminal possession of forged instruments, concluding that the trial court had erred in denying the defendant's motion to suppress two forged documents that the defendant contended were the product of an unlawful stop. *Id.* at 399.

In *Zamora-Martinez*, Hillsboro police and a federal immigration agent executed a search warrant at the defendant's sister's house. The defendant's sister was not present and, because all the adults who were present were taken into custody, the sister's children would have been left without adult supervision. At his sister's request, the defendant went to the residence to pick up the children. *Id.* at 399. When the defendant arrived, the Hillsboro officers asked why the defendant was there and, when he explained, the federal immigration agent asked to see the defendant's identification. *Id.* at 399-400. The defendant then produced an Oregon identification card, and the immigration agent asked the defendant where he was from. When the defendant responded, "Mexico," the agent asked whether the defendant had any other identification—and, in response, the defendant produced a resident alien card and a Social Security card, both of which the agent immediately recognized as forgeries. *Id.* at 400.

The dispositive issue with respect to suppression was whether the defendant had been stopped before he produced the second set of identifying documents (which became the basis for the criminal charges). *Id.* at 400-01. In reversing

---

("I don't know the statute off hand, but there is a statute that prohibits explicit material to minors")—a person in defendant's circumstances could reasonably have understood that he or she was the subject of a criminal investigation.

the trial court's denial of suppression, we agreed with the defendant that (at least for purposes of the objective component of the *Holmes* type (b) inquiry) the encounter escalated into a stop when the agent "asked whether [the] defendant had additional identification." *Id.* at 401.

In so holding, we concluded that the initial request for identification did not effect a stop because it was for a valid noninvestigatory purpose (*i.e.*, to confirm that the defendant was, in fact, who he said he was—and, thus, was authorized to pick up the children). *Id.* at 403 ("[A] reasonable person seeking to take custody of children would expect to be asked for identification."). When, however, the defendant presented an apparently valid Oregon identification card, that valid noninvestigative purpose had been satisfied—and, thus, a person in the defendant's circumstances could reasonably have understood that the immigration agent's purpose in requesting additional identification "was not to ascertain [the] defendant's identity before releasing his nieces into his care, but to investigate whether [the] defendant was lawfully residing in the United States." *Id.* at 404. Consequently, the agent's request that the defendant produce additional identification effected an unlawful stop. *Id.*

Here, Gerba's initial question to defendant about his age was the functional equivalent of the agent's initial request for identification in *Zamora-Martinez*. At least arguably, Gerba's question was "noninvestigative" in nature. However, once Gerba indicated his disbelief of defendant's answer by requesting that he produce identification, the investigative character of the inquiry was manifest, and the encounter escalated into a stop. Again, a person in defendant's circumstances could reasonably have understood that the officer intended, at least, to confirm the validity of the information in any identification that was produced and that he or she was not free to leave until (at the earliest) the officer received such confirmation.

With the beginning of the stop so fixed, this case comports with the standard *Hall* construct. That is, inculpatory information (defendant's name and date of birth), which ultimately was the predicate for Gerba's knowledge of defendant's "suspended" status and consequent arrest, was

obtained *after* defendant was stopped. If, however—as the lead opinion concludes—the stop did not begin until Gerba actually called dispatch in defendant's presence, then the only information that was obtained from defendant was elicited *before* the unlawful stop began, and suppression would be improper.

■ In *Hall*, the Supreme Court explained that the purpose of the exclusionary rule under Article I, section 9, is to "vindicate a defendant's personal rights" by "restor[ing] a defendant to the same position as if 'the government's officers had stayed within the law.' " 339 Or at 24 (quoting *State v. Davis*, 295 Or 227, 234, 666 P2d 802 (1983)). Thus, the exclusionary rule is inapposite where "the defendant has not been disadvantaged as a result of the unlawful police conduct or, stated differently, [where] the defendant is not placed in a worse position than if the governmental officers had acted within the bounds of the law."[5] *Hall*, 339 Or at 25. Here, if one concludes (as does the lead opinion) that no stop occurred until Gerba contacted dispatch to confirm defendant's personal information, then defendant was not placed in a "worse position" with respect to his ultimate arrest for driving while suspended than he would have been if Gerba "had acted within the bounds of the law." *Id.*

To put the matter in more concrete terms, ***if the stop did not begin until Gerba contacted dispatch,*** then:

(1) Gerba lawfully obtained defendant's personal identifying information *before* any stop occurred.

(2) Gerba did not elicit any information or consent from defendant after the stop and before he arrested defendant for driving while suspended.

(3) Although Gerba learned of defendant's license suspension when dispatch responded to his initial contact in defendant's presence, that response was based on defendant's identifying information, which Gerba had lawfully obtained.

---

[5] As the Supreme Court has repeatedly emphasized, Oregon's exclusionary rule is not predicated on a rationale of deterring unlawful police conduct. *See, e.g.,* *Hall*, 339 Or at 24 n 14; *State v. Sargent*, 323 Or 455, 462 n 4, 918 P2d 819 (1996).

Thus, assuming *arguendo* the premises of the lead opinion, the rationale for suppression reduces to the fact that Gerba's initial contact with dispatch occurred *while Gerba was still in defendant's presence*—and that, but for that circumstance, there would not have been an unlawful stop. However, defendant was not placed in any constitutionally cognizable "disadvantage" *vis-à-vis* his ultimate arrest because of that circumstance. To be sure, defendant was disadvantaged because of Gerba's *call* to dispatch in that, but for that call, Gerba would never have known that defendant's license was suspended and, in turn, would never have arrested defendant. But there is nothing unlawful about an officer contacting dispatch to confirm information; that is hardly an unlawful police practice. Bluntly, there is nothing constitutionally objectionable about the call *qua* call.

Again, under the lead opinion's reasoning, the constitutionally objectionable circumstance, transforming otherwise lawful police conduct (the call to dispatch) into an unlawful stop, was that the call occurred in defendant's presence. But that circumstance had no effect on the information that Gerba received from dispatch—*i.e.*, dispatch would have informed Gerba of defendant's license suspension, regardless of whether Gerba had called when he was outside the store, in defendant's presence, or in his patrol car grabbing a quick gulp of coffee. Nor did that circumstance affect defendant's interactions with Gerba. In short, notwithstanding that Gerba called dispatch in defendant's presence, defendant was "not placed in a worse position" with respect to his arrest than if Gerba "had acted within the bounds of the law" by contacting dispatch out of defendant's presence. *See Hall*, 339 Or at 25.

The upshot is that, if one assumes that the unlawful stop did not begin until Gerba contacted dispatch in defendant's presence, defendant suffered no constitutionally cognizable detriment from that stop that warrants suppression. Nevertheless, because a reasonable person could have understood that his or her liberty had been substantially restrained at an earlier point in this particular encounter—specifically, when Gerba took defendant's identification—suppression could be required, depending on the trial court's determination with respect to defendant's subjective belief.

*See, e.g., Zamora-Martinez*, 229 Or App at 404; *Parker*, 225 Or App at 616-17. Accordingly, the case must be vacated and remanded for that determination.[6]

**DEITS, S. J.,** dissenting.

I agree with the lead opinion that the stop in this case did not occur until Deputy Gerba contacted dispatch. However, I do not agree that suppression is required here. As discussed in the concurrence, the only inculpatory information that was obtained from defendant by questioning, consent, or observation was his name and date of birth. That information was obtained before Gerba made the contact with dispatch and consequently, in my opinion, before the stop occurred. Accordingly, for the reasons explained in the concurrence, defendant suffered no constitutionally cognizable detriment from the stop that requires suppression. 231 Or App at 640-42 (Haselton, P. J., concurring). I would affirm the trial court's denial of the motion to suppress. Therefore, I respectfully dissent.

---

[6] I concur in the lead opinion's disposition of defendant's second assignment of error, pertaining to the alleged insufficiency of the charging instrument.