*394 LINDER, J.
In two recent cases, we have held that officers who had lawfully seized individuals for purposes of investigation also could, consistently with Article I, section 9, of the Oregon Constitution, request and verify the individuals’ identifications. In particular, in State v. Fair, 353 Or 588, 609, 302 P3d 417 (2013), we held that an officer may temporarily detain a person whom the officer reasonably suspects of being a material witness to or victim of a recent or ongoing crime. We further held that, under the circumstances of that case, the officer constitutionally could request the witness’s identification and check for outstanding warrants against her, in an attempt to verify the witness’s identity and to obtain information otherwise relevant to the officer’s investigation. Id. at 614. After deciding Fair, we decided State v. Watson, 353 Or 768, 305 P3d 94 (2013). In Watson, we held that an officer, in the course of a lawful stop for a traffic offense, may request the driver’s identification and check the status of his or her driving privileges. Id. at 782.
This case presents yet a third variation on the issues that arise when police seek identification from persons with whom they deal in the course of their work: Does an officer’s request for and verification of a person’s identification, in and of itself, convert an encounter that is not a seizure for constitutional purposes into one that is? As we explain, we hold that the answer is no. Consequently, we reverse the decision of the Court of Appeals and affirm the judgment of the trial court.
I. FACTS AND PROCEDURAL HISTORY
Deputy Gerba was monitoring a “triple-X” store that sells adult sexual materials (toys, videos, clothing, etc.). The store had been robbed several times in the recent past, and law enforcement had made frequent security checks on it as a result. On the particular night involved in this case, Gerba was “sitting on” the store, meaning that he was monitoring it from outside and across the street, as well as by occasionally going inside.
At about 1:00 a.m., Gerba was inside the store at the same time that defendant and his girlfriend were inside *395 shopping. Gerba thought that defendant looked “pretty young” and believed he might be under the posted 18-year minimum age to be in the store. Gerba knew that, if they were minors, as he suspected, the store could “get in trouble” because of the “pretty explicit stuff” that was readily visible to anyone inside.[1] Gerba therefore approached the two and asked their ages. Defendant answered that he was 22. Gerba asked both defendant and his girlfriend if they had any identification, and they gave him their driver licenses. Gerba called dispatch to verify the validity of the licenses.[2] After having the licenses for a total of 10 to 15 seconds, Gerba returned them to defendant and his girlfriend and wished them a good day.[3] Gerba then left the store to continue to monitor it from outside, while defendant and his girlfriend continued to shop inside.
Gerba had not asked dispatch to check on anything other than the validity of the licenses, such as outstanding warrants. Even so, dispatch called Gerba back to advise him that defendant’s license was suspended and defendant was on probation in another county. That call came about a minute after Gerba returned the licenses, as Gerba was leaving the store. Gerba continued across the street, where he maintained his security watch on the store. After about five minutes, defendant and his girlfriend walked out of the store, got in their car, and left, with defendant driving. Based on his belief that defendant was driving with a suspended license, Gerba pursued them, initiated a traffic stop, and arrested defendant. Defendant was later tried for driving *396 while revoked (his license actually had been revoked, rather than suspended).
Before trial, defendant moved to suppress all evidence from his encounter with Gerba in the store {i.e., his identity and the status of his driving privileges), arguing that Gerba had unlawfully “stopped” defendant either when he requested defendant’s identification or, in the alternative, when he called dispatch to verify defendant’s identification. The state responded that the encounter between Gerba and defendant had not amounted to a seizure or, if it had, Gerba’s actions were supported by his reasonable suspicion that defendant was not old enough to be inside the age-restricted store.
The trial court denied defendant’s motion, concluding that Gerba had not seized defendant. The trial court reasoned that the time involved — 10 to 15 seconds — was de minimis and Gerba had not investigated defendant for any possible wrongdoing on his part, but rather, had attempted to determine if he was a minor as a protective measure, in which case he should not have been in the adult-only store.[4] The trial court concluded that, in that situation, a reasonable person in defendant’s position would not feel significantly restrained by the officer’s request for, and verification of, defendant’s identification. After a bench trial, the trial court found defendant guilty of driving while revoked.
*397 On appeal, the Court of Appeals concluded that, from an objective standpoint, defendant had been seized. State v. Backstrand, 231 Or App 621, 632, 220 P3d 748 (2009). The court was divided on its rationale, however, particularly as to the point at which the seizure had objectively occurred. The lead opinion concluded that, when Gerba called dispatch, a reasonable person in defendant’s position would have believed that he was not free to leave while the call was being made. Id. at 626. The lead opinion remanded to the trial court to determine whether defendant also subjectively felt that he was not free to leave at that point. Id. at 632.[5] The lead opinion concluded that, if the trial court were to find that defendant subjectively felt restrained, then Gerba had unlawfully seized defendant.[6] Id. at 625-26. The lead opinion further concluded that if, on remand, the trial court determined that defendant subjectively felt restrained, the evidence of the status of defendant’s driving privileges should be suppressed. Id. at 632.
A concurring opinion took a different view on the “timing of the operative ‘stop.’” Id. at 633 (Haselton, P. J., concurring). According to the concurrence, Gerba seized defendant “when, in response to Gerba’s inquiries, defendant produced, and Gerba took, defendant’s driver’s license.” Id. Under that view, the concurrence agreed that suppression was required if defendant subjectively felt restrained once he handed his license to Gerba. Id. at 642. Finally, *398 according to a dissenting opinion, the lead opinion was correct that Gerba had seized defendant when Gerba made the call to dispatch, but suppression was not required. Id. at 643 (Deits, S. J., dissenting).[7]
Both defendant and the state sought review, and we originally held the petitions pending our decision in State v. Ashbaugh, 349 Or 297, 244 P3d 360 (2010). After issuing our decision in Ashbaugh, we allowed both the petitions. On review, the state renews its assertion that defendant was not seized at any point during his encounter with Gerba. In the state’s view, Gerba’s actions in requesting and verifying defendant’s identification were not a sufficient restraint on defendant’s liberty or freedom of movement to amount to the seizure of defendant. Defendant argues the converse, urging that he was seized either when Gerba requested and obtained his identification, or when Gerba called dispatch, because a reasonable person in defendant’s position would have believed that he was not free to continue shopping until the officer’s investigation was complete.
II. ANALYSIS
A. General Principles Governing Seizures
As we explained at the outset, the central question that this case presents is: Does an officer’s request for and verification of a person’s identification, in and of itself, convert an encounter that is not a seizure for constitutional purposes into one that is? The general principles that guide our answer to that question are well-settled and were discussed at some length in our two most recent “stop” cases, Fair, 353 Or at 593-95, 598-603, and Watson, 353 Or at 773-74, 778-80. For our analysis here, it is helpful to summarize those principles.
Article I, section 9, guarantees individuals the right to be “secure in their persons * * * against unreasonable search, or seizure.” As this court has long recognized, encounters between law enforcement officers and citizens are of an “infinite variety.” State v. Holmes, 311 Or 400, 406, 813 P2d 28 (1991). Of that infinite variety, “only some implicate *399 the prohibition in Article I, section 9, against unreasonable ‘seizures.’” Ashbaugh, 349 Or at 308. As we have described in numerous cases:
“Analytically, police-citizen encounters typically fall into one of three categories that correlate the degree of intrusiveness on a citizen’s liberty with the degree of justification required for the intrusion. At one end of the continuum are mere encounters for which no justification is required. At the other end are arrests, which involve protracted custodial restraint and require probable cause. In between are temporary detentions for investigatory purposes, often termed ‘stops,’ which generally require reasonable suspicion. Both stops and arrests are seizures for constitutional purposes, while less restrictive encounters are not.”
Fair, 353 Or at 593-94 (citations and footnote omitted).
What distinguishes a seizure (either a stop or an arrest) from a constitutionally insignificant police-citizen encounter “is the imposition, either by physical force or through some ‘show of authority,’ of some restraint on the individual’s liberty.” Ashbaugh, 349 Or at 309. The test is an objective one: Would a reasonable person believe that a law enforcement officer intentionally and significantly restricted, interfered with, or otherwise deprived the individual of his or her liberty or freedom of movement. Id. at 316.[8] Because of the diversity of potential police-citizen encounters, the inquiry necessarily is fact-specific and requires an examination of the totality of the circumstances involved. Holmes, 311 Or at 408. As we recently acknowledged in Fair, “in practice, the line between a ‘mere encounter’ and something that rises to the level of a ‘seizure’ does not lend itself to easy demarcation.” 353 Or at 595. Rather, as this court recognized in Holmes, the standard is necessarily vague “when *400 unadorned by judicial interpretation based upon specific fact situations” and does not provide “a ready answer for every conceivable” police-citizen encounter that can arise. 311 Or at 410. As a result, “In many cases it is clear that a person has been ‘seized.’ But there are many instances in which it is less obvious whether a police-citizen encounter is a ‘seizure.’” Id. at 407.
Although close cases can — and frequently do— arise, beginning with Holmes, this court has remained steadfast in recognizing that the constitutional concern is with police-imposed restraints on citizen liberty, not with limiting contacts between police and citizens. In an oft-cited and oft-quoted passage, Holmes stressed that “law enforcement officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful.” 311 Or at 410; see also State v. Gerrish, 311 Or 506, 513, 815 P2d 1244 (1991) (flagging down driver and directing him to stop not a significant interference with driver’s liberty where those are only means available to get driver’s attention long enough to request information). The fact that the citizen is discomforted by an officer’s approach and request for assistance or information — either because the officer is a known police officer, or because the encounter otherwise involves “inconvenience or annoyance” — does not make the contact a seizure. Holmes, 311 Or at 410. Rather, a seizure exists only if the officer’s conduct would be reasonably perceived as coercive in the sense that it would cause the citizen to reasonably believe that the officer is intentionally restraining the citizen’s liberty or freedom of movement in a significant way — that is, in a way that exceeds the bounds of ordinary social encounters between private citizens. Id. at 409-10.[9]
*401 Thus, a “show of authority” as used in this context is shorthand for a more precise concept. The fact that a law enforcement officer conveys his or her official status as such — as officers do by, for example, wearing uniforms, displaying their badges, driving in marked patrol cars, and verbally identifying themselves as police officers — is not a “show of authority” that gives rise to a seizure in the constitutional sense. What is required is a reasonable perception that an officer is exercising his or her official authority to restrain. Explicitly or implicitly, an officer must convey to the person with whom he is dealing, either by word, action, or both, that the person is not free to terminate the encounter or otherwise go about his or her ordinary affairs. *402 Necessarily, then, the fact that an individual — for reasons personal to that individual — feels obliged to cooperate with the officer simply because of the officer’s status is not the form or source of coercion that is of constitutional concern. As Holmes held, 311 Or at 410, and as other authorities have observed of the parallel federal standard for what constitutes a seizure, police need not articulate any particular degree of suspicion to “to seek cooperation, even where this may involve inconvenience or embarrassment for the citizen, and even though many citizens will defer to this authority of the police because they believe — in some vague way — that they should.” American Law Institute, A Model Code of PreArraignment Procedure § 110.1, 258 (1975) (Model Code). Professor LaFave agrees, acknowledging that,
“if ‘the moral and instinctive pressures to cooperate are in general sound and may be relied on by the police,’ then a street encounter does not amount to a * * * seizure merely because of those pressures — that is, merely because the other party to the encounter is known to be a policeman.”
Wayne R. LaFave, 4 Search and Seizure § 9.4(a), 581 (5th ed 2012) (quoting Model Code § 110.1 at 258 (footnote omitted)).[10] Rather, “the confrontation is a seizure only if the officer adds to those inherent pressures by engaging in conduct significantly beyond that accepted in social intercourse.” Id. at 581-82 (emphasis added); see generally Holmes, 311 Or at 410 (“encounter is a ‘seizure’ of a person only if the officer engages in conduct significantly beyond that accepted in ordinary social intercourse”). Again, what is required is a show of authority by which, through words or action, the officer’s conduct reasonably conveys that the officer is exercising his or her authority to significantly restrain the citizen’s liberty or freedom of movement.[11]
*403 B. Police Requests For Information or Cooperation Generally
Consistently with Holmes’s declaration that officers remain free to approach citizens, request or impart information, and seek assistance, this court has cautioned that “verbal inquiries [by officers] are not *** seizures.” State v. Rodgers/Kirkeby, 347 Or 610, 622, 227 P3d 695 (2010). Rather, something more than just asking a question, requesting information, or seeking an individual’s cooperation is required of an officer’s conduct. The “something more” can be such things as the content or manner of questioning, or the accompanying physical acts by the officer, if those added factors would reasonably be construed as a “threatening or coercive” show of authority requiring compliance with the officer’s request. Ashbaugh, 349 Or at 317; see also State v. Ehly, 317 Or 66, 76-77, 854 P2d 421 (1993) (mere requests for cooperation not seizures unless officer, through demeanor, tone, language, or totality of circumstances, conveyed a *404 restraint on liberty). Without the something more, however, “police inquiries in and of themselves require no justification and do not necessarily implicate Article I, section 9.” Rodgers/Kirkeby, 347 Or at 624.
Several of our cases illustrate that principle in practice. One of the earliest is Ehly, which was decided about two years after Holmes first articulated the standard for distinguishing “mere encounters” from police conduct that results in a seizure for constitutional purposes. In Ehly, two officers confronted the defendant in a motel room after he refused to leave at check out and return the room key to the manager. The officers immediately told the manager to “stand back” and advised the defendant that he had to leave. When the defendant picked up two bags and started to leave, the officers asked him to return the key to the manager. The defendant replied that the key might be in one of the bags, but that the bags did not belong to him. One officer then asked him to find the key. The defendant tried, rummaging through one of the bags unsuccessfully, at which point the officer encouraged him to dump the bag’s contents onto the bed because both of the defendant’s hands were concealed within the bag as he searched for the key. When the defendant continued to search the bag, the officer, concerned that a weapon was in the bag, put her hand on her gun and ordered the defendant to “back up,” which he did; the officer then grabbed the bag herself and dumped the contents out. Ehly, 317 Or at 68-72, 79.
This court concluded in Ehly that the defendant was seized for purposes of Article I, section 9, at the point that the officer ordered the defendant to back up. Id. at 79. The officers’ requests before that point, individually and in combination, to leave, to find the key, and to dump out the contents of the bag did not, however, result in seizing him. Rejecting the defendant’s argument that the requests were “‘poorly disguised commands,”’ the court reasoned that — in light of the trial court’s factual findings — “nothing about the officers’ demeanor, their tone of voice, the nature of their language, or the time, place, or manner of the encounter” supported a conclusion that a reasonable person would have believed that his liberty had been significantly restrained *405 before the officer directed him to stand back from the bag that defendant was searching through. Id. at 76, 78.[12]
Ashbaugh involved a similar conclusion on much different facts. In Ashbaugh, two officers on bicycles approached the defendant and her husband while they were sitting in a public park in the middle of the day. The officers investigated their identities and checked to see if either of them was wanted on outstanding warrants. When the officers learned that the defendant’s husband was subject to a restraining order that prevented him from having contact with the defendant, the officers arrested him for violating that order and took him to a requested patrol car. About five minutes later, the officers returned to the defendant, who had not left the park, to tell her that her husband wanted her to take his belongings with her. On impulse, one of the officers asked the defendant if she had anything illegal in her purse. When she said she did not, he asked if he could search her purse, and she agreed. Ashbaugh, 349 Or at 300-02. The state conceded at a pre-trial proceeding that the initial contact with the defendant and her husband was an unlawful stop. Id. at 302-03 n 2.
Given the state’s concession, the seizure question before this court was limited to whether the officers had seized the defendant when they recontacted her, asked her about the contents of her purse, and asked if she would permit them to search her purse. Id. at 306, 308. In concluding that the defendant was not seized at that point, this court acknowledged that “it is possible to restrict a person’s liberty and freedom of movement by purely verbal means.” Id. at 317. But we reasoned that nothing in the content of the questions asked, or in the officers’ manner or actions, involved a “show of authority” that the defendant could reasonably construe as a threat or an exercise of authority to coercively restrain. The court observed that, “while it may have been true that [the] defendant had been unlawfully detained by *406 police some minutes before and had watched a clear show of authority directed at her husband, those circumstances had ended.” Id. Consequently, this court concluded that the officer’s questions to the defendant did not “intentionally and significantly” restrict or interfere with her liberty, and a reasonable person in the defendant’s circumstances would not believe that they had. Id.
In other cases, the circumstances accompanying verbal questions or requests have led this court to conclude that the defendant was seized, not by an officer’s questions per se, but given the context in which they were asked and the totality of the circumstances otherwise involved. Rodgers/ Kirkeby, in particular, emphasized the importance of context. Rodgers/Kirkeby involved two cases consolidated for purposes of the court’s opinion. Both involved lawful stops of vehicles for traffic offenses. In Rodgers, officers completed their investigation of the offense, but did not issue a citation. Then, although he lacked reasonable suspicion, one of the officers proceeded to question the defendant about possible drug activity and to ask for consent to search without advising the defendant that he was free to leave. 347 Or at 613-15, 626. In Kirkeby, after obtaining all information relevant to the reason for the stop, the officer asked for consent to conduct a patdown, after which he asked for consent to examine items in the defendant’s pockets. Id. at 615-16.
This court determined that, in each instance, the questions and request for consent resulted in an unlawful seizure. Id. at 627-28. In explaining that conclusion, the court first acknowledged that, in general, “verbal inquiries are not searches and seizures,” even when made in the course of, and unrelated to, a traffic stop. Id. at 622. The problem in Rodgers/Kirkeby was that the unrelated inquiries at issue were not in the due course of the traffic stop, but came afterwards — that is, they came at a point when the officers no longer had authority to detain the defendants. Id. at 623. As the court explained, “in contrast to a person on the street” or otherwise in public who has not been stopped for a traffic offense, a person detained for a traffic offense has a legal obligation to stop at the officer’s direction and remain; the person may not unilaterally end *407 the encounter and leave whenever he or she chooses. Id. at 622-23. From the standpoint of a reasonable person in the defendants’ position, when the officers in both cases, after completing the investigation of the traffic offenses, asked unrelated questions and asked for consent to search, but did not tell the defendants that they were free to leave, those verbal inquiries communicated a continuation of the traffic stop, even though the officers no longer had authority to detain. Id. at 627-28. In that distinctive context, the verbal inquiries alone continued the seizures, and continuation of the seizures was unlawful.
Finally, State v. Jacobus, 318 Or 234, 864 P2d 861 (1993), illustrates more generally how the manner of questioning and attendant circumstances may affect the analysis. There, an officer had been advised that the occupants of a particular Datsun car parked near a convenience store had been overheard by a customer saying that “there was only one clerk in the store.” When the officer drove to the store, he saw the Datsun parked in an unlighted area nearby and drove past it. As he went past, the occupants frantically began to stuff objects under the seats. The officer made a U-turn, pulled in behind the Datsun, and turned on his patrol car’s overhead lights. Two occupants got out of the car and walked toward the store. The officer approached the Datsun on foot. The defendant, who remained in the Datsun, continued to stuff something under coats and other items on the floorboard. When the officer asked the defendant to step out, he stayed in the Datsun. The officer repeated his request at least two more times before the defendant complied. Id. at 236. Characterizing the officer’s repeated requests as “ordering]” the defendant out of the car, the court held, without extended analysis, that the defendant’s liberty was temporarily restrained because the defendant, at least at the moment of the order, was not free to “remain in the Datsun or even *** to get out of the Datsun and walk away.” Id. at 240-41.[13] Implicit in the court’s seizure *408 analysis was its conclusion that the surrounding circumstances (patrol car parked behind the Datsun with overhead lights activated), coupled with the persistence of the officer’s “requests,” rendered those requests the functional equivalent of a command affirmatively communicating to the defendant that compliance was not optional.
C. Police Requests for Identification and Verification of Identification
Police requests for identification are a subset within the general category of police requests for information or cooperation. But asking for and verifying identification is not unique to police-citizen encounters. Rather, as other courts have observed, in this day and age, requests for valid government-issued identification are commonplace in ordinary dealings in society, both between private citizens as well as in a variety of citizen-government contexts (such as entering public buildings). See, e.g., Golphin v. State, 945 So 2d 1174, 1189-90 (Fla 2006), cert den, 552 US 810 (2007) (“[T]he act of identifying oneself through presentation of valid, government-issued identification [is] a necessary part of a panoply of human endeavors, from cashing a check to boarding an airplane.”).[14] Police officers, in their official dealings with citizens, likewise commonly seek to determine and verify with whom they are dealing for reasons that range from simply documenting the activities the officers engage in while on duty to ascertaining information that may assist in enforcement of the criminal laws. See, e.g., Fair, 353 Or at 614 (officer checked potential witness for outstanding warrants as means of verifying identification and ascertaining information relevant to investigation *409 of domestic assault); State v. Ellenbecker, 159 Wis 2d 91, 98, 464 NW2d 427, 430 (1990) (where it is reasonable for officer to ask for license, running status check on license carries out “deterrent function of the law”).
Until now, this court has not been asked to decide— and has not in fact decided — whether an officer effectively seizes an individual simply by asking for an individual’s identification. Where the issue is that straightforward— based on the request alone and nothing more — the circumstance comes well within the bounds of a “mere encounter,” which, as we held in Holmes, police remain free to have with citizens without implicating Article I, section 9. 311 Or at 410. Asking for identification is exactly the kind of interaction that Holmes contemplated — a request for information and a citizen’s cooperation. Id. Thus, we agree with the United States Supreme Court, which has held for purposes of the Fourth Amendment that an officer’s questions relating to identity or a request for identification do not result in a seizure unless the circumstances of the encounter are “so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded.” INS v. Delgado, 466 US 210, 216-17, 104 S Ct 1758, 80 L Ed 2d 247 (1984).[15] For purposes of Article I, *410 section 9, our conclusion is the same: A mere request for identification made by an officer in the course of an otherwise lawful police-citizen encounter does not, in and of itself, result in a seizure.
We have, however, decided cases in which we concluded, from the totality of circumstances, that police conduct that included a request for identification was sufficiently coercive to result in a seizure. The first of those cases was State v. Warner, 284 Or 147, 585 P2d 681 (1978). There, officers were investigating a reported armed robbery of a bar by two men late at night. The officers entered a second bar in a small town about 8 miles from the town where the robbery had occurred after seeing two men pull up to it and go inside. Without reasonable suspicion to believe that they were the men who committed the robbery, one officer stopped them as they began to leave. The officer told the two men about the robbery, said that he needed to ask them some questions, and asked them to return inside the bar; once back inside, the officers asked the men to remove their wallets from their pockets, take out their identifications, and place that identification on the table in front of them. The officer then informed the defendant that he could “be on [his] way” as soon as the officer was able to “clear this matter up.” According to the officer, he did not order the defendant to do anything, and the defendant was not obligated to remain, although the defendant was not told that. Id. at 150-52. The court concluded that the officer’s actions in having defendant place his identification on the table, coupled with his statement that he was investigating a robbery and that the defendant and his companion would be on their way as soon as officers could clear up the matter, was, given “all the circumstances,” a temporary restraint of the defendant’s liberty. Id. at 165.
*411 State v. Painter, 296 Or 422, 676 P2d 309 (1984), similarly involved more than a mere request for identification. In that case, a deputy asked the defendant to produce his identification when he encountered the defendant in an alley at 3:00 a.m. The defendant turned over an expired Virginia driver’s license and credit cards. The deputy retained those items while he frisked the defendant, called in a radio check of the identification, waited for the results of the radio check, and inquired further about the make and location of the defendant’s car, which the defendant explained was broken down nearby. Id. at 424. This court concluded that the deputy had seized the defendant, given that the “defendant was, in fact, unable to leave” and thereby was unable to terminate the encounter and avoid the frisk at the point when the deputy had “retained [the] defendant’s license and credit cards.” Id. at 425.
A final illustrative case is State v. Hall, 339 Or 7, 115 P3d 908 (2005). In Hall, an officer parked his vehicle next to the defendant as the defendant was walking along a street. The officer motioned for the defendant to approach the officer’s vehicle, and the officer then exited his vehicle as the defendant neared. The officer asked to see the defendant’s identification. When the defendant handed his identification to the officer, the officer radioed dispatch and requested a warrant check. While awaiting the results of the warrant check, the officer returned the identification and proceeded to question the defendant about whether he was carrying any weapons, knives, or illegal drugs. The defendant responded in the negative. In response, the officer asked the defendant for consent to search his person, and the defendant consented. The search revealed evidence of unlawful drug possession. Id. at 10-11.
This court concluded that the encounter began as a noncoercive engagement between the officer and the defendant, but evolved into a seizure in the course of the officer’s investigation. The court explained that the officer’s “initial actions of stopping his vehicle next to [the] defendant and then gesturing for [the] defendant to approach him did not intrude upon [the] defendant’s liberty of movement [.}” Id. at 19. But the court concluded that the nature of the encounter changed when the officer took the defendant’s identification *412 and conducted a warrant check. The court acknowledged that the officer promptly returned the defendant’s identification, but maintained that, at that point, the defendant was aware that he was the subject of a pending warrant check and, because of that fact, it was “difficult to posit” that a reasonable person would have felt free to leave. Id. The court further observed that the officer
“did nothing to dispel what would have been an objectively reasonable belief that defendant was restrained from leaving until [the officer] had received the results of the warrant check. Instead, immediately upon returning [the] defendant’s identification card, [the officer] questioned [the] defendant about whether [the] defendant was carrying any weapons, knives, or illegal drugs, and he asked [the] defendant for consent to search [his] person.”

Id.

In combination, Warner, Painter, and Hall confirm, at least implicitly, our holding today. Police remain free to approach citizens and to ask for or impart information and to seek their cooperation. Asking a citizen to identify himself or herself and to show police a formal piece of identification is a form of cooperation and involves the kind of information that, as a general proposition, police are free to request. But when the content of the questions, the manner of asking them, or other actions that police take (along with the circumstances in which they take them) would convey to a reasonable person that the police are exercising their authority to coercively detain the citizen, then the encounter rises to the level of a seizure, the lawfulness of which must be analyzed as such.
The purely legal issue that remains is whether verification of identification is a further circumstance that elevates a mere encounter to a seizure. We see no principled basis for concluding that, when an officer checks the validity of a proffered identity or piece of identification, such an action per se conveys to a reasonable person — who is not otherwise restrained and who has willingly tendered the information to the officer — that the officer is now exercising his or her authority to coercively restrain the person’s liberty or freedom of movement. To be sure, as we have already discussed, a *413 person tendering identification to an officer may not subjectively feel comfortable refusing the officer’s request. Instead, for any number of personal reasons or instincts, the person may be unwilling to decline the officer’s request. Those internalized motivations and feelings, however, are not the test for whether there is a seizure under Article I, section 9.[16] A person who turns over identification to a law enforcement officer reasonably would expect that the officer will take steps to verify its validity. For the officer to do so does not objectively convey an exercise of the officer’s authority to restrain the person’s liberty or freedom of movement. The circumstance is akin to when a person gives valid consent to search. Part and parcel with giving consent is a reasonable person’s expectation that he or she will likely either need or want to stand by while the officer performs the search. The person who waits while a consent search is completed is not thereby seized for purposes of Article I, section 9. So, too, with a person who, in a noncoercive setting, gives an officer his or her identification for the officer’s examination. The fact that the officer conducts that examination is not, in and of itself, a basis to conclude that the otherwise noncoercive encounter has become a coercive restraint on the person’s liberty.
D. Analysis of the Circumstances of this Case
With those conclusions in place, we turn to the specific circumstances of this case to determine whether Gerba, either by requesting defendant’s identification or by verifying *414 its validity, seized defendant for purposes of Article I, section 9.[17] As we will explain, we conclude that he did not.
As we previewed, defendant first argues that Gerba seized him by asking defendant his age and asking to see his identification. In making that argument, defendant focuses on the context in which Gerba made the request. In particular, defendant points to the fact that defendant was in an age-restricted store when Gerba approached him and made those requests. In that setting, defendant reasons, a reasonable person in defendant’s position would have believed that Gerba was investigating him to determine if he should be in the store, and he therefore was required to remain and interact with Gerba.
We agree that the age-restricted nature of the store provided significant context for determining whether anything in the content of Gerba’s questions made what would otherwise be a “mere encounter” an exercise of police coercion. Asking a person his or her age in such a setting with no accompanying exercise of authority to restrain, however, would not cause a reasonable person to believe that the officer had significantly restricted his or her liberty.[18] To the contrary, at most, a person so questioned might reasonably *415 expect to be told to leave if he or she either would not or could not produce valid identification sufficient to verify that he or she was not a minor. That consequence, however, would not be coercive for purposes of Article I, section 9. As this court observed in Ehly, where police advised the defendant that he had to leave his motel room and asked him to return the key, “it would be anomalous to conclude that a request of this nature made by officers whose avowed intent was to get a person to leave” was a seizure of the person. 317 Or at 78. Put simply, even a coercive ejection of a person who has no lawful right to remain on premises (and here, such an ejection was at most a prospect, not a present reality) is not a restriction on the person’s liberty — no liberty to remain exists in that circumstance.
Equally important, a reasonable person engaged in an age-restricted activity would expect to be questioned about his or her age, particularly if the person objectively appears close to the minimum age or within an age range where it is customary (as for purchasing alcohol) to request proof of age. Proof-of-age requests and examinations are customarily made in those settings, by private proprietors of businesses (bartenders, clerks of stores where alcohol or tobacco are sold) as well as by law enforcement personnel. Asking a person’s age and requesting proof of it is not conduct “significantly beyond that accepted in ordinary social intercourse” in that setting. Holmes, 311 Or at 410. A reasonable person shopping in a store where minors are not allowed would likely consider those questions appropriate and expected, even if they caused “inconvenience or annoyance”; a reasonable person would not reasonably view those questions, however, as conveying a significant restraint on the person’s liberty or freedom of movement. See id. at 411 (a reasonable motorist encountering a motor vehicle accident would “expect some delay or interruption in his or her travel[; although possibly annoyed or inconvenienced ***, a reasonable motorist would appreciate being advised of what was happening”).
Thus, consistently with the general rule that verbal inquiries ordinarily are not seizures, there was nothing distinctive about the content of Gerba’s questions that caused *416 his mere inquiries to amount to a seizure.[19] Neither did the manner of Gerba’s request to see defendant’s identification amount to a seizure. Defendant points to nothing — and the record reveals nothing — to suggest that Gerba was overbearing, intimidating, or coercive in his demeanor or behavior. Gerba merely asked for, and defendant complied with, his request for identification. Defendant was not seized as a result of Gerba’s request.
Defendant nevertheless argues that, even if the deputy’s questioning did not have the effect of seizing him, he was seized once Gerba had obtained his identification. Citing Painter, 296 Or at 425, defendant asserts that he was seized when Gerba accepted his license because he “was, in fact, unable to leave.” Painter does not stand for the proposition that an officer seizes a person by simply accepting and looking at a person’s identification after a noncoercive request; rather, at a minimum, some exercise of coercive authority by the officer, such as retention of the identification after examination and a continuation of investigatory activities, is required. See id. (seizure when officer retained defendant’s identification and credit cards before frisking him, running radio check, and questioning him because the “[defendant was, in fact, unable to leave”). No similar exercise of coercive authority occurred in this case. Gerba did not “retain” defendant’s license beyond a reasonable period for purposes of examining and verifying it, which was dis-positive in Painter. Rather, Gerba held defendant’s license for 10-15 seconds before returning it. We are hard-pressed to see how holding a person’s license for no more than 15 seconds, pursuant to the person’s voluntary production of that license, could result in a significant restriction of a person’s liberty on that basis alone. For those reasons, we conclude that defendant was not seized when Gerba accepted and inspected defendant’s identification.
*417 Alternatively, defendant argues that the nature of the encounter shifted when Gerba called the identifying information in to dispatch to check the validity of the license. As we have already concluded, an officer’s verification of the validity of a proffered piece of identification is not conduct that per se would convey to a reasonable person that the person is being forcibly or authoritatively detained. That is especially true when, as here, the person has not previously been subject to any coercive or authoritative restraint. Here, Gerba simply took an action (a verification call to dispatch) that a reasonable person in defendant’s place in such a circumstance would likely expect to accompany an officer’s request to see identification. Within a matter of seconds, the verification was sufficiently complete for Gerba to return the licenses, wish defendant and his girlfriend a nice day, and leave them to go about their shopping. Gerba’s action in calling dispatch to verify the license was not a coercive restriction on defendant’s liberty. And certainly, it was not significantly so. For the 10 to 15 seconds it took for Gerba to make that call, defendant did not go from being a citizen with full liberty and freedom of movement to one who was seized for purposes of Article I, section 9.
III. CONCLUSION
In summary, we reaffirm that police requests for information or cooperation do not implicate Article I, section 9, as long as the officer does no more than seek the individual’s cooperation through noncoercive questioning and conduct. A request for identification, in and of itself, is not a seizure. Nor is an officer’s act of checking the validity of that identification, in and of itself, a seizure. For a request and verification of identification to amount to a seizure, something more is required on an officer’s part. Either through the context, the content or manner of questioning, or the other circumstances of the encounter, the officer must convey to a reasonable person that the officer is exercising his or her authority to significantly restrain the citizen’s liberty or freedom of movement.
Here, defendant was not seized either by Gerba’s request to see defendant’s identification or by Gerba’s call to dispatch to check the validity of that identification. No other *418 circumstances, in combination with Gerba’s requests and verification, would have led a reasonable person in defendant’s position to conclude that the officer was restraining him. The trial court therefore correctly denied defendant’s motion to suppress.
The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

 It is a misdemeanor offense for the owner, operator, or manager of a business to permit minors, if not accompanied by a parent or lawful guardian, to enter or remain where obscene materials are displayed. ORS 167.080.

 Gerba testified that, although he could have determined both defendant’s and the girlfriend’s age from the face of the licenses, he ran the licenses through dispatch to make sure that they were not “fake.” He explained, “[w]hen somebody has a fake ID, if we run it, it comes back unable to locate.”

 Defendant’s girlfriend testified at the suppression hearing, but defendant did not. According to her, Gerba asked for their IDs, and they gave them to him. After Gerba called to verify them, he handed them back, explaining to the two that they “looked awful young.” He then said, “thank you.” The only significant difference between Gerba’s and the girlfriend’s testimony was that the girlfriend described Gerba as holding the licenses for “several minutes” before returning them. The trial court, however, expressly found the historical facts to be as Gerba had related them and made the specific factual finding that Gerba had possessed the licenses for only 10 to 15 seconds.

 Justice Walters’s concurring opinion characterizes Gerba’s interaction with defendant as conduct that “would cause a reasonable person in defendant’s position to believe that he was the subject of a criminal investigation and therefore that he must stop, respond, and remain.” See, e.g., 354 Or at 418, 419-20 (Walters, J., concurring in the judgment) (officer’s investigation of validity of defendant’s license would reasonably be perceived as investigation of one or more identity-related crimes). In our view, as our analysis will reveal, the fact that an officer asks a citizen for cooperation in the course of conducting a criminal investigation is not a talisman in the analysis, as it is for Justice Walters. For that reason, we decline to debate whether a person in defendant’s position would have believed he was the subject of a “criminal investigation.” We note only that the proposition seems especially doubtful in this setting. Three statutes that Justice Walters cites as “crimes” that, objectively, defendant might have thought the officer to be investigating are simply inapplicable in this circumstance. See ORS 162.247(l)(a) (crime to prevent officer from performing lawful duties); ORS 162.385 (crime to give false information to officer when being cited for crime); ORS 807.620 (crime to give false information to officer enforcing motor vehicle laws). And it seems like a stretch to say that a reasonable person who had not attempted to buy anything in the store or produced identification to that end would have believed he was being investigated for a violation of ORS 165.805 (crime for minor to misrepresent age to secure a benefit by law denied to minors).

 After the Court of Appeals issued its decision, this court decided State v. Ashbaugh, 349 Or 297, 316, 244 P3d 360 (2010), in which we revised the test for a seizure under Article I, section 9, by abandoning the prong that considered a defendant’s subjective belief that his liberty or freedom of movement was significantly restrained. In light of Ashbaugh, the remand that the Court of Appeals ordered was unnecessary.

 The lead opinion reasoned that any seizure of defendant would be unlawful because the officer had no reasonable suspicion that defendant was engaged in criminal activity. We recently held in Fair, however, that an officer may, in appropriate circumstances, constitutionally stop and detain a person on reasonable suspicion that the person is a material witness to or victim of a crime. 353 Or at 609. Here, the trial court expressly found that the officer reasonably believed that defendant and his girlfriend may have been minors and that he asked for and verified their ages as a protective measure to determine if they were in fact minors in an adult-only store. We need not decide whether, under Fair, the officer reasonably could have seized defendant as a potential witness or victim under the circumstances presented in this case because we conclude that defendant was not seized. For present purposes, it suffices to note that the Court of Appeals’ rationale for concluding that the seizure would have been unlawful was too narrow.

 Because we decide that defendant was not seized, we do not describe the Court of Appeals’ various views on whether suppression was required.

 In clarifying the test in Ashbaugh, we described it as having two prongs, either of which can result in a constitutionally significant seizure. 349 Or at 304. One prong asks whether an officer has intentionally and significantly restricted the individual’s liberty or freedom of movement; the other asks if a reasonable person would believe that the officer has so restricted him or her. Id. at 309. The state in this case urges us to reconsider that test and eliminate the first prong, reasoning that it is subsumed in the second and adds nothing of independent value to the analysis. As the parties agree, however, this case involves only the second prong of the test — that is, what a reasonable person would believe based on the officer’s conduct. We decline the state’s invitation to revisit the value of the first prong of the test in a case that does not adequately implicate it.

 Justice Walters, in her concurrence, relegates her discussion of the analytical construct adopted in Holmes to a footnote and essentially treats Holmes as superfluous to the analysis. 354 Or at 424 n 3 (Walters, J., concurring in the judgment). Justice Brewer, in his separate concurrence, expresses his view that the Holmes construct of “mere conversation” is a fiction and less than helpful to the analysis. 354 Or at 428,431-32 (Brewer, J., concurring in the judgment of the court). As this court observed most recently in Ashbaugh, our efforts “to explain what the constitutional term ‘seizure’ embraces” have not been entirely successful or satisfying. 349 Or at 310. We could malee the same observation about the general fabric of *401 constitutional seizure law from which Holmes borrowed the analysis. See Holmes, 311 Or at 407 (citing State v. Warner, 284 Or 147, 161, 585 P2d 681 (1978), which in turn embraced the analysis that had developed under the Fourth Amendment); see generally Wayne R. LaFave, 4 Search and Seizure § 9.1-9.4, 352-645 (5th ed 2012) (exhaustive discussion of legal developments post-Terry v. Ohio, 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968), by which arrests and temporary detentions are subject to constitutional protection against unreasonable seizures, but nonforcible or noncoercive encounters are not).
Our adherence to Holmes in this case does not mean that our work in refining what constitutes a “seizure” for purposes of Article I, section 9, is done. But Holmes has been a settled part of our Article I, section 9, jurisprudence for more than two decades, and we have reembraced it as recently as Watson, 353 Or at 774, Fair, 353 Or at 593-94, and Ashbaugh, 349 Or at 308-09, albeit with modest refinement in Ashbaugh. The parties’ arguments throughout — from the trial court proceedings through briefing and argument in this court — have been based on acceptance of the essential construct that Holmes announced. In a proper case, and with considered arguments by the parties before us, we can continue to examine the scope of the term “seizure” for purposes of Article I, section 9, and the law in that regard appropriately should continue to evolve. Justice Brewer is not alone in his dissatisfaction with the prevailing analysis. See, e.g., Edwin J. Butterfoss, Bright Line Seizures: The Need for Clarity in Determining When Fourth Amendment Activity Begins, 79 J Crim L & Criminology 437, 439 (1988) (it is generally accepted that, in fact, citizens almost never feel free to end an encounter initiated by a police officer and walk away; literal application of a “free-to-leave” test would result in virtually all police-citizen encounters being seizures); see also Lewis R. Katz, Terry v. Ohio at Thirty-Five: A Revisionist View, 74 Miss L J 423, 458 n 177 (2004) (most citizens do not feel free to terminate an encounter with police when approached in a public place, and such contacts are “regrettably” characterized as “mere encounters” (quoting Robert J. Burnett, Random Police-Citizen Encounters: When is a Seizure a Seizure?, 33 Duq L Rev 283, 287 (1995)). But a change to the constitutional standard must be made consistently with our criteria for altering settled precedent. See generally Farmers Ins. Co. v. Mowry, 350 Or 686, 693-94, 261 P3d 1 (2011) (discussing application of stare decisis in cases involving constitutional provisions). As important, such a change must be animated by and tailored to policies embodied in the terms of Article I, section 9, and not our own normative values of how police and citizens do or should interact. Unless and until those considered arguments are before us, we properly adhere to Holmes.

 See also United States v. Tavolaaci, 895 F2d 1423, 1424 (DC Cir 1990) (federal seizure test “assumes that the citizen is aware of police duties to keep the peace and prevent crime, and that that awareness, coupled with feelings of civic duty, moral obligation, or simply proper etiquette, will often lead a reasonable person to cooperate” (internal quotations omitted)).

 The federal test under the Fourth Amendment is often described as whether a reasonable person would feel or believe himself to be “free to leave.” See, e.g., United States v. Mendenhall, 446 US 544, 554, 100 S Ct 1870, 64 L Ed 2d 497 (1980) (seizure within meaning of Fourth Amendment occurs “only if, in view of all of the circumstances * * *, a reasonable person would have believed that he was *403 not free to leave”). But as this court recognized in Holmes, the feel-free-to-leave formulation does “not state the entire [federal] test for a ‘seizure’ of a person by a non-forcible ‘show of authority.’” 311 Or at 413; see also Gerrish, 311 Or at 517 (whether reasonable person would feel free to leave “is not determinative” of federal analysis). Rather, as the Supreme Court has clarified, whether a reasonable person would have believed that he was not free to leave
“states a necessary, but not a sufficient, condition for :i: * * [a] seizure effected through a ‘show of authority.’ * * * [T]he test for existence of a ‘show of authority is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer’s words and actions would have conveyed that to a reasonable person.”
California v. Hodari D, 499 US 621, 628, 111 S Ct 1547, 113 L Ed 2d 690 (1991) (last emphasis added). Under that more complete articulation of the federal test, the analysis of what constitutes a seizure under Article I, section 9, and under the Fourth Amendment is not meaningfully different. See, e.g., Holmes, 311 Or at 414 (reasons for rejecting defendant’s federal seizure claim “similar” to those for rejecting claim under Article I, section 9); Gerrish, 311 Or at 517-18 (“As with our analysis under Article I, section 9, we believe that the minimal intrusion of the encounter was not a constitutionally material interference with [the] defendant’s liberty’ under the Fourth Amendment.).
We decline to distill the test under Article I, section 9, to a feel-free-to-leave formulation. That formulation tends to direct the focus to a citizen’s internal feelings, beliefs, and thoughts, while simultaneously distracting from the correct focus, which is the officer’s words and actions and what they would convey to a reasonable person. We instead adhere to the test as we stated it in Holmes and revised it in Ashbaugh, which requires a show of authority by an officer that would cause a reasonable person to believe that the officer intentionally and significantly has restricted, interfered with, or otherwise deprived the citizen of the citizen’s liberty or freedom of movement. Ashbaugh, 349 Or at 316.

 As Ehly emphasized, the legality of a particular search depends significantly on the facts of a particular case, and what “actually happened is a question of fact for the trial court.” 317 Or at 74-75. A trial court’s findings of historical fact are binding on an appellate court and, if the trial court does not make express findings on all pertinent issues, the appellate court will view the record in a light most favorable to the trial court’s ruling and presume that the facts were decided in a manner consistent with the trial court’s ultimate conclusion. Id. at 75.

 The court analyzed the circumstances in Jacobus to determine if they constituted a stop for purposes of ORS 131.615(1). Well before that decision, this court had recognized that statute as codifying both the state and federal constitutional standards for a lawful investigatory stop based on reasonable suspicion of criminal activity. See State v. Valdez, 277 Or 621, 624-26, 561 P2d 1006 (1977) (discussing origins of stop statute); see also State v. Kennedy, 290 Or 493, 497, 624 P2d 99 *408 (1981) (Oregon stop statutes were intended to codify decisions by this court interpreting Article I, section 9, and the United States Supreme Court interpreting the Fourth Amendment), rejected in part on other grounds by State v. Hall, 339 Or 7, 20, 115 P3d 908 (2005), and State v. Stevens, 311 Or 119, 136-37, 806 P2d 92 (1991). Consequently, in a case involving suspicion of criminal activity, as Jacobus did, the analysis under Article I, section 9, necessarily would be the same as under OES 131.615(1).

 See also State v. Martin, 2011-0082, p 9 (La 10/25/11); 79 So 3d 951, 957 (individual is “practically immobilized” in modern society without adequate identification); People v. Jackson, 39 P3d 1174, 1189 (Colo 2002) (“[t]he need for identification is pervasive in today’s society”), abrogated on other grounds by Brendlin v. California, 551 US 249, 259, 127 S Ct 2400, 168 L Ed 2d 132 (2007).

 The United States Supreme Court has adhered to that holding. See, e.g., Hiibel v. Sixth Judicial Dist Court of Nev, 542 US 177, 185, 124 S Ct 2451, 159 L Ed 2d 292 (2004) (“In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment.”). Thus, throughout the country, as a matter of governing federal law, there is no constitutional barrier to an officer requesting identification in what is otherwise a lawful officer-citizen encounter. The federal circuits have, however, split on the narrower question of whether and when retention of identification results in a seizure. One view is that it is a per se seizure whenever an officer retains identification longer than reasonably necessary to examine it. See, e.g., United States v. Jordan, 958 F2d 1085, 1086 (DC Cir 1992) (seizure if officer retains identification after reasonable opportunity to review it, because it is “difficult to imagine that any reasonable person would feel free to leave without it” (quoting United States v. Battista, 876 F2d 201, 205 (DC Cir 1989)). The competing view is that retention of identification longer than reasonably necessary to review and verify it is a factor to consider, but is not dispositive in analyzing whether a citizen has been seized. See, e.g., United States v. Weaver, 282 F3d 302 (4th Cir 2002) (so holding). In terms of state court interpretations of the parallel provisions of their own state constitutions, we have found no state court that holds that an officer’s request for identification, without more, results in a citizen’s seizure. Our review of both state and federal cases suggests that no court has held or would hold, as the concurrences would, that a seizure occurred under the circumstances presented in this case. See 354 Or at 418 (Walters, J., concurring in the judgment) (concluding the officer’s conduct in asking *410 for and verifying defendant’s identification was a seizure); 354 Or at 432 (Brewer, J., concurring in the judgment of the court) (same). Nor do the other authorities on which Justice Walters relies support that result. See, e.g., Aidan Taft Grano, Casual or Coercive? Retention of Identification in Police-Citizen Encounters, 113 Colum L Rev 1283,1315-19 (2013) (under Fourth Amendment, police remain free to request and verify identification; better rule among the divided federal circuits, however, is that retention of identification longer than reasonably necessary is a per se seizure).

 Social science studies confirm what courts and others have long recognized— that citizens often feel an internal inclination to cooperate with police officers. 354 Or at 420 (Walters, J. concurring in the judgment) (citing studies). They do not demonstrate that citizens believe, reasonably or otherwise, that officers are exercising their official authority to restrain them by a request for information or cooperation and that officers are thereby in fact restraining them. Indeed, some of the same social science suggests that affirmative advice that a person does not need to respond or is free to leave is unlikely to counter the internal inclination that many people feel to cooperate with an officer’s request. See, e.g., David K. Kessler, Free to Leave? An Empirical Look at the Fourth Amendment’s Seizure Standard, 99 J Crim L & Criminology 51, 84-85 (2009) (social science shows that adding warning requirement would be of questionable value, because people who know their rights feel same obligation to cooperate as those who do not). Yet Justice Walters suggests that advice of that kind would preclude a conclusion that the encounter was a seizure. We are, therefore, unsure of the point of Justice Walters’s reliance on those studies.

 When Gerba contacted dispatch to verify the validity of defendant’s license, he did not ask dispatch to check anything else. That verification occurred swiftly — Gerba returned the licenses within 10 to 15 seconds, defendant and his girlfriend then continued their shopping, and Gerba left the store to continue his security watch outside. Although Gerba did not ask dispatch to check anything else, dispatch did so, and as Gerba was leaving the store dispatch called him to tell him that defendant’s license was suspended (it was, in fact, revoked) and that defendant was currently on probation. Because Gerba neither requested that later-provided information nor did so in defendant’s presence, we do not have the occasion in this case to decide whether and under what circumstances additional checks (such as one for outstanding warrants) might convert the encounter into a seizure.

 The trial court explicitly found that Gerba made the inquiries that he did in an effort to determine whether defendant was under the minimum age required to be in the store. The trial court also found that Gerba’s purpose was protective — he wanted to make sure that defendant was not exposed to the explicit materials on display in the store if, as Gerba suspected from defendant’s physical appearance, defendant was too young to be in the store. Those findings on the officer’s subjective intent and state of mind do not control the analysis. They have some relevance, however, insofar as they reflect a state of mind consistent with the officer’s objective actions, his behavior, and the overall context of the encounter.

 Justice Walters, in her concurrence, misunderstands the point of our preceding discussion. The point is not that the test for a seizure depends on whether the officer’s “show of authority was expected, appropriate, or reasonable.” 354 Or at 424 (Walters, J., concurring in the judgment). Nor is the point that the analysis turns on the reasonableness of the restraint, instead of the fact of restraint. Id. at 422. The point is to respond to defendant’s argument. Thus, contrary to defendant’s argument, the circumstances in which the officer made the request for defendant’s identification did not convert that verbal request, which ordinarily is not a seizure, into an action that conveyed, as it must under the legal test that we adhere to, a significant restraint on the person’s liberty or freedom of movement.