Submitted on remand April 17, affirmed October 8, 2014

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CODY GEAN CANFIELD,
*Defendant-Appellant.*

Washington County Circuit Court
C090743CR; A143570

338 P3d 166

Peter Gartlan, Chief Defender, and David O. Ferry, Senior Deputy Public Defender, Office of Public Defense Services, filed the briefs for appellant.

John R. Kroger, Attorney General, Mary H. Williams, Solicitor General, and Karla H. Ferrall, Assistant Attorney General, filed the answering brief for respondent. Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor

General, and Karla H. Ferrall, Assistant Attorney General, filed the supplemental brief.

Before Wollheim, Presiding Judge, and Nakamoto, Judge, and Schuman, Senior Judge.

WOLLHEIM, P. J.

**WOLLHEIM, P. J.**

This case is before us for the third time. In *State v. Canfield*, 251 Or App 442, 283 P3d 438 (2012) (*Canfield I*), we concluded that the trial court had correctly denied defendant's motion to suppress evidence. On reconsideration, we agreed with defendant that we had based a portion of our analysis on a misunderstanding of the facts, and under the correct understanding of the facts, defendant had consented to a search in the course of an unlawful stop. We therefore reversed the trial court's denial of defendant's motion to suppress. *State v. Canfield*, 253 Or App 574, 291 P3d 775 (2012) (*Canfield II*).[1] The state petitioned the Oregon Supreme Court for review, challenging our conclusion that there had been an unlawful stop. That court allowed review, vacated our decision, and remanded the case to us for reconsideration in light of *State v. Backstrand*, 354 Or 392, 313 P3d 1084 (2013), *State v. Highley*, 354 Or 459, 313 P3d 1068 (2013), and *State v. Anderson*, 354 Or 440, 313 P3d 1113 (2013). *State v. Canfield*, 354 Or 837, 325 P3d 738 (2014) (*Canfield III*). For the reasons set forth below, we now affirm the trial court's denial of defendant's motion to suppress.

We take the facts as set forth in *Canfield I*:

> "An officer in a patrol car in Beaverton saw defendant walking down the street. After the officer drove by, defendant crossed the street and walked quickly toward a mall. The officer made a U-turn and followed defendant. Defendant walked into a parking lot and got into a parked car on the passenger side. The car traveled a short distance in the parking lot and then parked in the parking lot again. The driver of the car and defendant got out of the car and began walking toward a fast-food restaurant.
>
> "The officer approached defendant and the driver and asked to speak with them. The officer told defendant that he saw defendant run across the street and that the officer thought it was strange that the car defendant was in had moved a short distance in the parking lot and then parked again. The officer asked defendant and the driver for identification, which they provided for him. The officer kept the identification long enough to write the numbers on

---

[1] The facts recited below from *Canfield I* are consistent with our analysis in *Canfield II*.

his hand—approximately 30 seconds—and then returned the identification to defendant and the driver. The officer noticed that defendant had a folding knife in the pocket of his pants. The officer asked defendant if he had any weapons or drugs. Defendant told the officer that he had a pipe, which the officer suspected was a marijuana pipe.

"The officer asked defendant and the driver if he could search them, and they both consented. The officer put defendant in a patdown or search position with his fingers interlaced behind his back. The officer told defendant that he was not under arrest, that the search position was how the officer conducted searches, and that defendant was free to leave. The officer testified that defendant indicated that he understood when the officer told defendant that he was free to go. During the search, the officer found defendant's pipe and noticed the pipe contained a burnt residue that smelled like marijuana. The officer moved on to the car's driver and repeated the same process. In addition, the officer asked the driver if there was any marijuana in the car and asked for consent to search the car. The driver told the officer that there was marijuana worth $20 in the car and consented to the search. The officer found the marijuana in the car. The driver told the officer that he had met with defendant to buy the marijuana from him. Defendant also made incriminating statements to the officer. The officer arrested defendant, who was charged with unlawful delivery of marijuana."

251 Or App at 443-44.

The question before us on remand is whether defendant was unlawfully stopped. The parties acknowledge that, in these circumstances, the officer who approached defendant had neither reasonable suspicion nor probable cause to justify a stop. Thus, the sole question is whether defendant was, in fact, "stopped" for purposes of Article I, section 9, of the Oregon Constitution at the time he consented to the search of his person.[2] As the court indicated in *State v. Holmes*, 311 Or 400, 410, 813 P2d 28 (1991), police are "free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called upon to

---

[2] Defendant does not argue that an unlawful stop occurred after he consented to the search.

articulate a certain level of suspicion in justification if a particular encounter proves fruitful." *See also State v. Unger*, 356 Or 59, 71, 333 P3d 1009 (2014) (Police may engage in conversation with a person and request the person's consent to search without stopping the person under Article I, section 9.).

The state asserts that, particularly in light of the application of that principle to the circumstances in *Backstrand, Highley*, and *Anderson*, the trial court correctly denied defendant's motion to suppress because defendant had not been "stopped." Defendant contends that our previous opinion was correct, because, under the circumstances described above, "a reasonable person [would] believe that a law enforcement officer intentionally and significantly restricted, interfered with, or otherwise deprived the individual of his or her liberty or freedom of movement." *Backstrand*, 354 Or at 399 (citing *State v. Ashbaugh*, 349 Or 297, 309, 244 P3d 360 (2010)). In particular, defendant asserts that the following circumstances, considered together, demonstrate that he was stopped at the time he consented to a search: The officer told defendant that he had seen defendant run across the street; the officer told defendant that he thought it was strange that defendant got into a car that had moved only a short distance and then parked again; the officer asked for identification from both defendant and the driver of the car, took the identification, wrote down identification information then returned the identification; the officer asked about weapons and drugs and requested consent to search. As explained below, we agree with the state that, on these facts, defendant was not stopped.

A review of the principles enunciated in *Backstrand, Highley*, and *Anderson* demonstrates why this was not a "stop" for constitutional purposes, but as the court in *Backstrand* acknowledged, "the line between a 'mere encounter' and something that rises to the level of a 'seizure' does not lend itself to easy demarcation." 354 Or at 399 (quoting *State v. Fair*, 353 Or 588, 595, 302 P3d 417 (2013)).

The court in *Backstrand* summarized its earlier case law in which it had concluded that no stop had occurred, including: *Holmes*, 311 Or at 409 (an officer is free

to approach persons on the street or in public places and question them); *State v. Gerrish*, 311 Or 506, 815 P2d 1244 (1991) (flagging down a driver and directing him to stop in order to request information was not a stop); *State v. Ehly*, 317 Or 66, 854 P2d 421 (1993) (police asking a defendant to find a key and to dump the contents of a bag were not a seizure); *Ashbaugh*, 349 Or at 317 (officers reapproaching a person who had previously been unlawfully stopped but allowed to leave, telling the person that her husband wanted her to take his belongings, and asking for consent to search her purse was not a seizure). *Backstrand*, 354 Or at 400-06. The court then contrasted those cases with two in which it had concluded that the defendants were stopped: *State v. Rodgers/Kirkeby*, 347 Or 610, 622-23, 227 P3d 695 (2010) (concerning lawful traffic stops where officers, rather than proceeding to issue traffic citations, instead initiated unrelated inquiries, noting that, "in contrast to a person on the street," a person "detained for a traffic offense has a legal obligation to stop at the officer's direction and remain; the person may not unilaterally end the encounter"); *State v. Jacobus*, 318 Or 234, 864 P2d 861 (1993) (repeatedly ordering a passenger out of a car in circumstances indicating that the passenger was neither free to remain in the car nor walk away was a stop). *Backstrand*, 354 Or at 406-07.

With those cases in mind, the court turned to the issue presented in *Backstrand*, "whether an officer effectively seizes an individual simply by asking for an individual's identification." *Id.* at 409. The court indicated that "the request alone and nothing more" did not constitute a stop for purposes of Article I, section 9. *Id.* The court went on to note that, in some circumstances, requests for identification, when accompanied by other police conduct, could constitute a stop. For example, in *State v. Warner*, 284 Or 147, 150, 585 P2d 681 (1978), a defendant was stopped when an officer required him to place his identification on a table and told him that he could be on his way after the officer "clear[ed] this matter up." In *State v. Painter*, 296 Or 422, 425, 676 P2d 309 (1984), the court concluded that a defendant was stopped when an officer took and retained his identification and credit cards. In *State v. Hall*, 339 Or 7, 19, 115 P3d 908 (2005), the court concluded that a defendant had been

stopped when an officer took the defendant's identification and returned it, but the defendant was aware that he was the subject of a pending warrant check. In that circumstance, the court concluded, it was objectively reasonable for the defendant to believe that he was not free to leave until the officer had received the results of the warrant check. *Id.*

The court contrasted those cases to the circumstances presented in *Backstrand,* where an officer had approached the defendant in a store that sold adult materials and checked his identification to ensure that he was old enough to be in the establishment. In doing so, the officer learned that the defendant's driver's license was suspended. The defendant left the store, and the officer later observed him driving and stopped him. *Backstrand,* 354 Or at 394-95. The court concluded that, under those circumstances, there was no stop in the store: "Within a matter of seconds, the verification was sufficiently complete for [the officer] to return the licenses, wish defendant and his girlfriend a nice day, and leave them to go about their shopping." *Id.* at 417.

In *Anderson,* the court considered a different set of circumstances that also involved asking for identification. There, officers were carrying out a search of an apartment when the defendant and one of his friends drove up, parked, approached the apartment, then quickly returned to their car after seeing the police there. 354 Or at 442-43. Three officers approached the car wearing police "raid vests," explained that they were executing a search warrant, asked why defendant and the driver had come to the apartment, and asked for their identification. Both denied having identification, and the defendant gave the officers a name that an officer knew to be false. *Id.* The question was whether the defendant had been unlawfully stopped before he provided the false name. Citing *Backstrand* for the proposition that simply requesting identification did not constitute a stop, the court went on to conclude that the additional circumstances did not transform the encounter into a stop, either. The court stated:

"[T]he question is whether the content of the officers' requests, the manner in which they were made, or the overall context of the contact elevated the encounter to the level

of a seizure by conveying to defendant and the driver that the officers would not allow them to leave. The record does not suggest, however, that the officers' tone or manner were overbearing or controlling, such that what otherwise were mere verbal exchanges were, in fact, something more. Nor was the content of the brief exchange coercive. [The officer's] explanation of the officers' reasons for the contact and the officers' requests for identification informed defendant and the driver that the officers were interested in why they had come to the apartment and what they knew about [the suspect's] activities. *That information objectively conveyed possible suspicion that the driver and defendant could be involved in criminal activity related to the apartment,* but they equally conveyed that the officers were interested in whatever information the two might be able to provide. In all events, by those brief verbal exchanges and inquiries alone, the officers did not communicate an exercise of authority of the kind required for a seizure."

*Id.* at 453 (emphasis added).

The court reached a similar conclusion in *Highley*. In that case, an officer approached a parked car, knowing that the driver had a suspended license, and spoke with the driver while the defendant and another passenger walked away. *Highley*, 354 Or at 461-62. While the officer continued to investigate the driver, the defendant and his companion returned to the area of the car. At that point, the officer asked to see their identifications (apparently because the officer had recognized the defendant and believed he might be on probation, although the defendant denied that he was). The officer wrote down their information, returned the identifications within a minute, and then contacted dispatch, which informed him that the defendant was no longer on probation. The officer then returned to the defendant and told him that the defendant had been correct about his probationary status, then sought consent to search, which eventually led to the discovery of evidence. *Id.* at 464. In concluding that the defendant had not been stopped, the court noted that the defendant had moved around freely throughout the encounter, that his identification had been retained only briefly, and that the defendant had been told that the officer had confirmed that he was not on probation. In those circumstances, the court concluded, the defendant was not

stopped. *Id.* at 470-71. The court contrasted those facts to *Hall*, in particular noting that the defendant in *Highley* was essentially "a bystander who was free to come, go, and move about at will, all of which he did," and further noted that, unlike in *Hall*, no warrant check was pending by the time the evidence was discovered. *Id.* at 473.

With the circumstances of those cases in mind, we return to the facts here that defendant contends demonstrate that he was unlawfully stopped. An officer saw defendant cross the street, then saw defendant enter the passenger side of a car, then saw the car move to a different parking space in the parking lot. As defendant and the car's driver walked toward a nearby restaurant, the officer approached and told defendant that he had seen defendant cross the street, said that he thought it was strange that they had moved the car, and asked them for identification. The officer retained their identification for only about 30 seconds. The officer asked defendant about drugs or weapons, and, after defendant acknowledged that he had a pipe, the officer asked for consent to search.

Defendant contends that, in those circumstances, the officer's statements would convey to a reasonable person that he was not free to leave, as the officer was investigating a possible drug offense, or possibly an "unlawful street crossing." The record does not indicate, however, that the officer was investigating any potential traffic-related offense. Rather, the record indicates—as did the officer's words to defendant—that the officer approached defendant and his companion because he thought their behavior was "strange." Additionally, we note, by the time the officer asked for consent to search, defendant had admitted he had a pipe on him. The officer, however, believed that defendant had a marijuana pipe, and did not suggest in any way to defendant that possession of such an item was a crime or that the officer was investigating.[3]

These circumstances are, frankly, somewhat less compelling than those at issue in *Anderson* and *Highley*, which are factually the most comparable of the three cases

---

[3] As noted, after defendant had acknowledged that he had a pipe, the officer had told defendant that he was free to leave. *Canfield II*, 253 Or App at 576.

that provided the basis for this remand. In *Anderson*, three officers who were quite clearly conducting a criminal investigation approached the defendant, indicating that their investigation of the criminal activity was potentially related to their investigation of the defendant; here, by contrast, one officer approached defendant to ask him about something "strange"—but noncriminal—that he had observed. In *Highley*, the officer who initially spoke with the defendant was investigating a driver for a traffic crime, but also made it clear to the defendant that he wanted to run an identification check to verify the defendant's statement that the defendant was not on probation. 354 Or at 462. The officer subsequently asked the defendant for consent to a search. In *Highley*, as in *Anderson*, there were multiple officers at the scene. *Id.* at 463.

In the present case, unlike in *Anderson*, there was no indication at the time the officer spoke to defendant that the officer was investigating any crime. And unlike in *Highley*, there was no indication that the officer was investigating a potential probation violation. Additionally, there was no retention of identification as in *Painter*, 296 Or at 425, there were no statements by the officer that defendant would only be free to leave *after* the officer had cleared things up, as in *Warner*, 284 Or at 150, and there was no pending warrant check underway, as in *Hall*, 339 Or at 19. Finally, there is nothing in the record here that would indicate that the officer's demeanor or manner or tone in questioning defendant was coercive. *See Backstrand*, 354 Or at 404-05. In short, there is nothing in the record that would indicate that the officer "intentionally and significantly restricted, interfered with, or otherwise deprived the individual of his or her liberty or freedom of movement." *Id.* at 399.

Affirmed.